**Harry Leon JOYNER, Appellant,**

v.

**Manly LANCASTER; County of Forsyth, Appellees.**

No. 85–2392.

United States Court of Appeals, Fourth Circuit.

Argued June 2, 1986.
Decided March 26, 1987.

Robert M. Elliot and David C. Pishko (Pfefferkorn, Pishko & Elliot, P.A., on brief) for appellant.

Michael A. Gilles and Bynum M. Hunter (Smith, Helms, Mulliss & Moore; P. Eugene Price, Jr., on brief) for appellees.

Before CHAPMAN and WILKINSON, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

HAYNSWORTH, Senior Circuit Judge;

The plaintiff, a former captain in the Forsyth County sheriff's department, brought this action against the county and the sheriff alleging that he was discharged in violation of his First Amendment rights. The district court concluded that the discharge was not unlawful, and we now affirm.

## I.

At the time of his discharge, Joyner was the senior of four captains in the sheriff's department. He had only two superior officers, Sheriff Lancaster and Major Dillon. The department employed more than one hundred fifty deputies, and Joyner, a captain in the Patrol Division, supervised fifteen deputies patrolling the county during his eight hour shifts. He was involved in planning, reviewing and evaluating the work of deputy sheriffs. He was required to work closely with other supervisory personnel to maintain effective departmental operations. He reported primarily to Major Dillon. He appears to have been a competent officer before the election campaign of 1982.

The sheriff of Forsyth County is elected for four year terms of office. In 1982, Sheriff Lancaster was a three-term incumbent, but he faced stiff opposition in the Democratic primary of that year from Robert Woods of the Highway Patrol. Woods was a good friend of Joyner, and in November 1981, Joyner told Sheriff Lancaster that he and others in the department would

support Woods if the sheriff decided not to run. According to Joyner, the sheriff told him that he would run but that, if elected, he probably would not serve the full term. He said that, if he decided to resign, he would hold an informal election within the department and recommend the appointment of the winner of that election as his successor.

Joyner was unenthusiastic about that proposal. He told Woods that Sheriff Lancaster, if reelected, planned to resign before completion of his four-year term, and Woods used that information in his public campaign against Lancaster.

There was testimony that Joyner had told a former officer that he expected to be the major in the department if his friend, Woods, was elected. That expectation was obviously a happier one than his anticipated lot if Lancaster was reelected. Joyner also testified that he disagreed with two personnel decisions made by Sheriff Lancaster, and he thought that Woods, as sheriff, would treat all departmental personnel fairly.

Relatively quiet support of Woods by Joyner became loud and open in May 1982. Within the department he advocated the election of Woods. While off duty and out of uniform, he passed out campaign literature at stores and shopping centers; he put up yard signs; he encouraged people he knew to vote for Woods, and, on election day, he engaged in electioneering for Woods at a polling place.

Sheriff Lancaster won the election.

Though some others in the department of lesser rank also supported Woods, but not so overtly as Joyner, Joyner's activities caused friction. Twenty to thirty members of the department reported to Sheriff Lancaster that Joyner's activities were causing pervasive distrust and plummeting morale. They urged him to take corrective action. Major Dillon, Lieutenant Oldham, the Internal Affairs officer, and Robert Nelson, the sheriff's administrative assistant, reported that Joyner's activities had caused, and were continuing to cause, problems. They recommended that Sheriff Lancaster discharge Joyner. Lieutenant Oldham told

Sheriff Lancaster that he would not and could not work with Joyner after the election.

Sheriff Lancaster testified that by the time of the election he had become convinced that Joyner's activities had caused much dissension and ill feeling in the department. Shortly after the election, the sheriff asked Joyner to resign. When Joyner refused to do so, the sheriff discharged him.

Joyner sought a preliminary injunction, which was denied. *Joyner v. Lancaster,* 553 F.Supp. 809 (M.D.N.C.1982). The district court also denied the defendants' motions for summary judgment, and the case went to trial.

At the trial, an advisory jury was impaneled and asked whether Sheriff Lancaster reasonably believed that Joyner's campaign activities on behalf of Woods could affect the morale, efficiency, discipline or administration of the department. The jury answered the question in the negative, but the district court concluded that the answer was against the clear weight of the evidence. The district court also determined that, notwithstanding its initial uncertainty, "the entire balancing process is for the Court." It then resolved the balancing test in the defendant's favor and dismissed the action.

### II.

There is no question in this case that Joyner's political activity was the cause of his discharge. The only substantive question is whether the free speech guaranty of the First Amendment, as applied to Forsyth County, North Carolina through the Fourteenth Amendment, lent such protection to that activity as to prevent his discharge from his public office.

### A.

The legality of discipline imposed upon a public employee because of the employee's speech is determined through a balancing process. *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). *Connick* was the most recent culmination

of a succession of cases in which the principle was developed. *See Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). Under that principle, the court must consider whether or not the speech implicated a matter of public concern. If a matter of public concern was implicated, the court must consider whether the employee's interest in the speech was outweighed by the employer's "interest in the effective and efficient fulfillment of its responsibilities to the public." *Connick,* 461 U.S. at 150, 103 S.Ct. at 1692. *See Jurgensen v. Fairfax County,* 745 F.2d 868, 878–79 (4th Cir. 1984); *Jones v. Dodson,* 727 F.2d 1329, 1334 (4th Cir.1984).

■ Each branch of the analysis is subject to many variables. On the first branch, speech in the public interest by a public spirited citizen is entitled to greater protection than speech in the interest of the speaker or of another whose cause the speaker advocates. On the other branch, the interest of the employer in maintaining efficiency in the rendition of public services will vary substantially with the nature of the employment relationship. As this court said in *Jurgensen,* "nonpolicymaking employees can be arrayed on a spectrum, from university professors at one end to policemen at the other. State inhibition of academic freedom is strongly disfavored.... In polar contrast is the discipline demanded of, and freedom correspondingly denied to[,] policemen." 745 F.2d at 880. Those kinds of variables have been noted by other courts. *See e.g., McMullen v. Carson,* 754 F.2d 936, 939–40 (11th Cir.1985); *Hughes v. Whitmer,* 714 F.2d 1407, 1419 (8th Cir.1983), *cert. denied,* 465 U.S. 1023, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984).

### B.

■ The weighing of this balance is a question of law for the court, not a question of fact for resolution by a fact finder. Relying on *Connick,* this court has held that the entire balancing process is an inquiry of law for the court. *Dodson,* 727 F.2d at 1334; *see also Berger v. Battaglia,* 779 F.2d 992, 998 (4th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 2278, 90 L.Ed.2d 720 (1986); *Jurgensen,* 745 F.2d at 878–80.

Joyner contends that it is the province of a jury or fact finder to determine the underlying facts to which the court then applies the legal standard. The clear implication of *Connick,* however, is to the contrary. Joyner finds support for his position in *Kim v. Coppin State College,* 662 F.2d 1055, 1064 (4th Cir.1981), but *Kim* predated *Connick.* Our subsequent cases have followed *Connick.* In *Dodson,* this court held that such questions "were not factual issues for the jury," but "involved questions of constitutional law for the court." 727 F.2d at 1337 n. 11; *see also Berger,* 779 F.2d at 998.

The district court properly concluded that the question presented is one of constitutional law for the court. In the resolution of that question, the advisory jury had no role to play. Even if its verdict had not been against the clear weight of the evidence, the entire matter was one for determination by the court.

### III.

■ Joyner contends that the district judge misapplied the balancing test. The district court, he says, erroneously minimized the constitutional stature of his campaign activities and improperly found that those activities caused the dissension within the department.

Joyner may have acted in part out of a conviction that Woods would make the better sheriff and would run a more efficient office in the public service. It is undeniable, however, that he acted in substantial part in his own interest. He evidently believed that if Lancaster were reelected and resigned, he, Joyner, would not win the straw vote and become the sheriff. He hoped that if Woods were elected, he would

be promoted to the position of major. To the extent that a public employee's expression is in furtherance of matters of personal concern, the public employer's burden of showing the predominance of the public's interest in continuing the efficient functioning of a public entity is lessened.

Joyner was a highly placed official in a para-military unit. He had only two superiors. He had an important role in the implementation of the sheriff's policies, and he was an essential link between the sheriff and the deputies whom he supervised. In those circumstances, mutual confidence and loyalty are of great importance. The combination of Joyner's vigorous campaign and his high position in the department created more than a potential for disruption; they actually created that disruption which would have sufficed for his discharge if it had only reasonably been apprehended.

It is no answer to say, as Joyner does, that the disruption in the department was simply a reflection of fear on the part of many members that if Sheriff Lancaster was not reelected they would lose their jobs. The rather violent reaction of the other members of the department may have stemmed in substantial part from concern about their own job security and not alone from a sense of loyalty to Sheriff Lancaster, but it was not their concerns that triggered the disruption. The disruption and antagonisms were immediately and directly caused by Joyner's political activity. There would have been no disruption in this case had not a highly placed insider engaged in partisan political activity that seemingly enhanced the threat to the job security of the other employees. The problems were not correctable by assurance of continued employment to the other employees. Sheriff Lancaster not unreasonably concluded that they were correctable only by removing Joyner from the department.

The district court properly weighed the balance and concluded that the sheriff's interest in the effective and efficient fulfillment of his department's responsibilities outweighed Joyner's interest in exercising his First Amendment rights. The public's interest in the removal of the source of disruption within the department was greater than Joyner's interest that, at least, in part, was personal, in openly supporting the sheriff's political opponent.

## IV.

Our conclusion makes it unnecessary to address the other contentions made on appeal.

AFFIRMED.