**Wayne HARTER and Robert Payne, Plaintiffs,**

**v.**

**C.D. VERNON, individually and in his official capacity as Sheriff of Rockingham County; and Rockingham County, Defendants.**

**Civil No. 3:95CV75.**

United States District Court,
M.D. North Carolina,
Rockingham Division.

March 22, 1996.

Martha A. Geer, Patterson, Harkavy & Lawrence, Raleigh, NC, for plaintiffs.

James Redfern Morgan, Jr., Womble, Carlyle, Sandridge & Rice, Winston–Salem, NC, for defendants.

James Edwin Pons, Office of Guilford County Attorney, Greensboro, NC, for movant.

## MEMORANDUM OPINION

BULLOCK, Chief Judge.

Two former employees of the Rockingham County Sheriff's Department ("Department") brought this suit alleging that they were discharged in violation of the First, Fifth,

and Fourteenth Amendments to the United States Constitution, the North Carolina Constitution, and the public policy of the state of North Carolina. Defendants have moved for summary judgment on all counts, and the court will partially grant that motion.

## BACKGROUND

The court takes the evidence in the light most favorable to Plaintiffs, as it must at this stage. Defendant Sheriff C.D. Vernon hired plaintiff Robert Payne as a deputy in December 1989 and plaintiff Wayne Harter as a dispatcher in January 1991. In 1994, Vernon stood for re-election against three candidates in the Democratic primary. By Vernon's admission, this was his toughest campaign yet.

According to Plaintiffs, Vernon put the resources of his office to work to get re-elected. Vernon ran the campaign out of his sheriff's office. There is some evidence that employees worked on the campaign while on duty and with Department property. Plaintiffs relate a few occasions when, while on the job, they and other Department employees were asked to support Vernon. The Department's second-in-command told officers at shift meetings how to donate money and where to obtain posters. According to Payne, officers were told "Remember who you're working for. The man gave you a job." Other officers also testify that Vernon's high-level assistants made campaign announcements during working hours.

Vernon did not personally confront Plaintiffs; however, coworkers Kathy and Bobby Knight report that Vernon told them that they had to throw themselves completely into the campaign by putting up posters and attending his campaign functions. Vernon also made statements that Bobby Knight interpreted as threats that the Knights would be fired seven weeks after the primary for failing to support him.

Plaintiffs gave Vernon's campaign meager support. Payne donated ten dollars to Vernon's campaign, but he did not vote for any candidate. Harter told Vernon that he supported him but preferred not to campaign for him. Neither participated further in the election, either for or against Vernon.

Around the time of the primary, Vernon began to investigate alleged wrongdoing by certain deputies. Members of the shift on which Payne worked were taking their breaks in the Sanitary Cafe restaurant without checking out by radio. Vernon's investigation revealed that five deputies had engaged in such behavior. Vernon talked with three of those deputies about these activities. He did not talk to two—Payne and Richard Lintecum—who did not actively support him. Those were the only two he fired.

Vernon says this investigation also revealed that Harter had engaged in unprofessional conduct over the telephone. Harter had joked with callers whom he knew and had derided day-shift workers. Vernon did not confront Harter about this conduct.

On July 15, 1994, Vernon fired seven of his employees, including Plaintiffs. There is evidence that each of the seven either supported Vernon's major opponent, was rumored to have done so, or had not actively supported Vernon.

## DISCUSSION

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is material if it could affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### I. *Eleventh Amendment Immunity*

Vernon requests that the court accord him immunity from suit in his official capacity under the Eleventh Amendment to the United States Constitution. The Eleventh Amendment provides a state with immunity from suits brought in federal court by her own citizens as well as by citizens of another state. *Edelman v. Jordan*, 415 U.S. 651, 662–63, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974). Also, state officers acting in their official capacity are entitled to Eleventh Amendment protection. *Gray v.*

*Laws,* 51 F.3d 426, 430 (4th Cir.1995). The Eleventh Amendment does not shield local government entities and officers from suit. *Id.* at 431.

Eleventh Amendment protection thus turns on whether Vernon, as sheriff of Rockingham County, was a state or local actor. Until recently, the Fourth Circuit employed a four-part test for Eleventh Amendment protection. *Gray,* 51 F.3d at 431 n. 2. Courts had to examine: (1) whether the state treasury was responsible for paying any judgment that might be awarded; (2) whether the official exercised a significant degree of autonomy from the state; (3) whether the official was involved with local versus state-wide concerns; and (4) how the official was treated as a matter of state law. *Id.* See *Ram Ditta v. Maryland Nat'l Capital Park & Planning Comm'n,* 822 F.2d 456, 457–58 (4th Cir.1987). Although courts were to balance all four factors, *see id.* at 460, the first factor carried great weight, *see id.* at 457. If the damages would be paid out of the state treasury, the official was always immune. *Bockes v. Fields,* 999 F.2d 788, 791 (4th Cir.1993), *cert. denied,* 510 U.S. 1092, 114 S.Ct. 922, 127 L.Ed.2d 216 (1994). The other three factors were relevant only when the state treasury would be unharmed by any judgment. *Id.* at 790–91.

The test became unsettled after *Hess v. Port Authority Trans–Hudson Corp.,* 513 U.S. 30, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994). In *Hess,* the Supreme Court stressed that the Eleventh Amendment exists to maintain the state's solvency and dignity. *Id.* at 51, 115 S.Ct. at 406. The Court thus emphasized that these two interests, rather than any other indicators, are the "prime guide" to the Eleventh Amendment inquiry. *See id.* at 47, 115 S.Ct. at 404.[1] In particular, the Court focused on the source of funds that would satisfy a judgment: "If the

expenditures of the enterprise exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness of the enterprise? When the answer is "No"—both legally and practically—then the Eleventh Amendment's core concern is not implicated." *Id.* at 51, 115 S.Ct. at 406.

While *Hess* established that some factors are more important than others, it did not mandate specifically how lower courts were to weigh those factors. It did not indicate whether the "solvency and dignity" questions are dispositive, or, if not, how that inquiry interacts with the lesser factors. *See Gray,* 51 F.3d at 433 (discussing questions left after *Hess* ). Therefore, in *Gray v. Laws,* the Fourth Circuit had to consider whether its prior approach had to be changed after *Hess.* The court read *Hess* to leave mostly intact the circuit's traditional Eleventh Amendment analysis: "In the end, we do not believe that *Hess,* as it applies to single state entities, materially altered [our prior] Eleventh Amendment analysis...." *Gray,* 51 F.3d at 434. While the circuit noted that *Hess* might require it to tinker with its balance of factors, *id.,* it did not direct how to adjust them. *See also Ristow v. South Carolina Ports Auth.,* 58 F.3d 1051, 1053 n. 4 (4th Cir.) (not "attempt[ing] to interpret the Court's language concerning state sovereignty and dignity"), *cert. denied,* —— U.S. ——, 116 S.Ct. 514, 133 L.Ed.2d 423 (1995). This court will not compose a new test. Instead, the established four-part test will be applied, keeping in mind the two concerns that underlie the inquiry according to *Hess.*[2]

## A. State Treasury Concerns

As discussed above, the most important consideration is the source of funds to pay any judgment. This circuit has said that

---

**1.** The Court rejected the dissent's position that the extent of state control should be dispositive of the immunity determination. *Hess,* 513 U.S. at 47, 115 S.Ct. at 404.

**2.** One more preliminary question remains: who bears the burden of proof on Vernon's status as an arm of the state? At least three circuits have recently ruled that the purported state official

bears this burden. *Christy v. Pennsylvania Turn-pike Comm'n,* 54 F.3d 1140, 1144 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 340, 133 L.Ed.2d 238 (1995); *Baxter v. Vigo County Sch. Corp.,* 26 F.3d 728, 734 n. 5 (7th Cir.1994); *ITSI TV Prods., Inc. v. Agricultural Ass'ns,* 3 F.3d 1289, 1291 (9th Cir.1993). This is consistent with this circuit's approach in *Beardsley v. Webb,* 30 F.3d 524, 531–32 (4th Cir.1994). Therefore, Vernon must satisfy this burden.

"it appears that a determination that the state treasury will be liable for a particular judgment is largely, if not wholly, dispositive of entitlement to Eleventh Amendment immunity." *Gray,* 51 F.3d at 433.

■ Vernon does not argue that the state will have to satisfy any judgment in this case. Indeed, Vernon's briefs refer the court to *Braswell v. Ellis,* 950 F.Supp. 145 (E.D.N.C. 1995) (order den. mot. for recons.), which holds that the state treasury does not have to satisfy judgments against sheriffs. 950 F.Supp. at 147–48. State statutes indicate several possible sources of payment, none of which is the state treasury.[3] In the face of this authority, Vernon has not shown that a penny of any judgment could possibly come from the state treasury. The court will consider the other factors in the Eleventh Amendment inquiry, recognizing, however, that this state treasury factor is largely, if not wholly, dispositive.

### B. Degree of Autonomy from the State

■ Vernon also cites *Braswell* for its holding that the state controls the sheriff so much that he is a state actor. The Eastern District concluded in *Braswell* that the sheriff is an arm of the state because the state constitution creates his office, N.C. Const. art. VII, § 2, and North Carolina statutes are full of provisions that govern sheriffs: the term of office, N.C.Gen.Stat. § 162–1 (1994); the qualifications of office, N.C.Gen. Stat. § 162–2 (1994); the duty to handle process, N.C.Gen.Stat. § 162–13 to –14 (1994); the duty to keep the jail, N.C.Gen. Stat. § 162–22 to –23, –32 to –61 (1994); and so forth. *Braswell,* 950 F.Supp. at 147–48. Therefore, *Braswell* holds that North Carolina sheriffs must be considered arms of the

state to protect the integrity of the sovereign state.

■ However, that logic is not convincing. First, an entity is not an arm of the state simply because North Carolina regulates it, or even because the state constitution creates it. *See Hess,* 513 U.S. at 47, 115 S.Ct. at 404. Municipalities are not entitled to Eleventh Amendment protection, *Gray,* 51 F.3d at 431, yet they too are created by the state constitution,[4] and are more extensively regulated than sheriffs, *compare* N.C.Gen.Stat. ch. 160A (1994) *with* N.C.Gen.Stat. ch. 162 (1994).

■ The proper inquiry is whether the sheriff, in his employment decisions, exercises a significant degree of autonomy from the state. The inquiry must focus narrowly on the actions alleged because the sheriff may be a state officer for some purposes but not others. *See Scott v. O'Grady,* 975 F.2d 366, 371 (7th Cir.1992), *cert. denied,* 508 U.S. 942, 113 S.Ct. 2421, 124 L.Ed.2d 643 (1993). The state statutes allow a sheriff to "appoint a deputy or employ others to assist him in performing his official duties." N.C.Gen. Stat. § 162–24 (1994). However, the state apparently has little control over the sheriff's employment practices. Instead, the sheriff has authority to hire and fire whom he wants, subject to slight limits from the county commissioners.[5] Thus, federal jurisdiction over Vernon would not interfere with the state's sovereignty and dignity because the state has nothing to do with his employment decisions. This factor weighs against Eleventh Amendment immunity.

### C. Statewide Versus Local Concerns

The third factor is whether the sheriff is involved with statewide or local concerns.

---

3. The sheriff must have a bond that covers judgments against him. *See* N.C.Gen.Stat. §§ 58–76–5, 162–8 (1994). Further, if the sheriff's official bond is insufficient, any commissioner of his county who, by reasonable diligence could have discovered the insufficiency, will be liable to the injured party. N.C.Gen.Stat. § 58–72–60 (1994). Finally, if the County's insurance policy covers Vernon, the insurance company may have to satisfy any shortfall. *Smith v. Phillips,* 117 N.C.App. 378, 381–84, 451 S.E.2d 309, 312–13 (1994).

4. Both municipalities and the office of sheriff are created in the "Local Government" section of the constitution. N.C. Const. art. VII.

5. "Each sheriff ... has the exclusive right to hire, discharge, and supervise the employees in his office." N.C.Gen.Stat. § 153A–103 (1991); *Peele v. Provident Mut. Life Ins. Co.,* 90 N.C.App. 447, 450, 368 S.E.2d 892, 894, *disc. review denied & appeal dismissed,* 323 N.C. 366, 373 S.E.2d 547 (1988). The board of commissioners can only fix the number of the sheriff's employees. N.C.Gen.Stat. § 153A–103.

The sheriff is elected by the voters of a single county. N.C.Gen.Stat. § 162–1. Many of his qualifications, powers, and duties are defined in terms of his locality. *See, e.g.,* N.C.Gen.Stat. § 162–2 (sheriff must be resident of county); N.C.Gen.Stat. § 162–22 (sheriff operates county jail). Vernon does not make any countervailing showing that the sheriff is involved primarily with statewide concerns. This factor weighs against Eleventh Amendment immunity.

### D. State Law Characterization of Sheriff

 Finally, the court must consider whether North Carolina law classifies a sheriff as a state or local official. This factor is not controlling:

> While "[a] state court's view of the status of a state political entity" may be relevant "in determining whether that entity is entitled to eleventh amendment immunity," "the question of whether an agency is the *alter ego* of the state and thereby immune from federal jurisdiction under the eleventh amendment is a question of federal, not state, law."

*Gray,* 51 F.3d at 435 (quoting *Ram Ditta,* 822 F.2d at 459, 458 n. 5).[6]

North Carolina courts do not consistently characterize sheriffs as either state or local. In *Messick v. Catawba County,* 110 N.C.App. 707, 431 S.E.2d 489, *disc. review denied,* 334 N.C. 621, 435 S.E.2d 336 (1993), the court of appeals held that a sheriff, because he is a state official, is not a "person" in Section 1983 suits for money damages. *Id.* at 713–14, 431 S.E.2d at 493.[7] However, that court has also held that a sheriff, because he is a local official, is not subject to the jurisdiction of the state industrial commission. *Hull v. Oldham,* 104 N.C.App. 29, 41, 407 S.E.2d 611, 618, *disc. review denied,* 330 N.C. 441, 412 S.E.2d 72 (1991). Thus, this factor does not point clearly in either direction.

After weighing all four factors, with due regard given to the two main concerns expressed in *Hess,* the court finds that Vernon has not shown that he is entitled to Eleventh Amendment immunity.

### II. Claims Against Defendant Rockingham County

The County seeks dismissal of all claims against it. The court will grant summary judgment to the County on Plaintiffs' Section 1983 claims because Vernon was not acting pursuant to a policy of the County. Further, the state law claims will be dismissed against the County because under state law the sheriff is not an agent of the county in employment decisions.

 A county may be liable only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037. This policy may be established by the actions of officials who have final policymaking authority with respect to the action. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988). The question before the court is whether the sheriff's employment decisions may be attributed to the County as its policy.

The court finds that the County cannot be liable under Section 1983 for Vernon's employment decisions. North Carolina gives the sheriff final policymaking authority on employment decisions. *See* N.C.Gen.Stat. § 153A–103. The county board of commissioners has minimal input into employment matters. It may fix the number of the sheriff's employees (so long as there are at least two deputies). *Id.* Also, it must approve the hiring of both the sheriff's relatives and certain criminals. *Id.* However, it cannot con-

---

**6.** Some of the decisions that Vernon cites rely entirely on state law characterizations of the sheriff. *See Jenkins v. Medford,* No. 1:95CV126–T, slip op. at 10–11 (W.D.N.C. Nov. 27, 1995) (mem. & recommendation of mag.); *Edwards v. Smith,* No. 5:94–CT–24–BR, slip. op. at 2, 1994 WL 910950 (E.D.N.C. Sept. 23, 1994) (order).

**7.** *Messick* loses much, if not all, of its persuasiveness because the court also appeared to rule that a county was a state agency and thus not a "person" under § 1983. 110 N.C.App. at 713–14, 431 S.E.2d at 493. This is wrong, *Monell v. Department of Social Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978), so it calls into question the court's understanding of the sheriff's status under § 1983 as well.

trol or review the sheriff's employment decisions. *See Peele,* 90 N.C.App. at 450, 368 S.E.2d at 894. Thus, a sheriff has final policymaking authority in employment decisions, but he does not exercise that authority on behalf of the county. *Hughes v. Bedsole,* 913 F.Supp. 420, 426–27 (E.D.N.C.1994), *aff'd on other grounds,* 48 F.3d 1376 (4th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 190, 133 L.Ed.2d 126 (1995); *Jones v. Cumberland County,* No. 3:94–CV–32–BR2, slip op. at 7, 1995 WL 494872 (E.D.N.C.1995) (order).

Plaintiffs contend that *Dotson v. Chester,* 937 F.2d 920 (4th Cir.1991), compels a different result. *Dotson* indicated that whether the sheriff's actions bind the county depends on the particular function that the sheriff is performing. *Id.* at 926–28. *Dotson* held that when a Maryland sheriff was operating the county jail, he had final policymaking authority for the county. *Id.* at 928. In order to reach that conclusion, the court exhaustively reviewed state and county law and determined that the county was responsible for its jail and had delegated to the sheriff the authority to keep it. *Id.* at 928–32. Here, on the other hand, the County had little control over Vernon's employment practices.[8]

Plaintiffs also argue that this court's holding is inconsistent with *Spencer v. Byrd,* 899 F.Supp. 1439 (M.D.N.C.1995). In *Spencer,* Judge Tilley decided that a county was an "employer" of a deputy sheriff under Title VII. *Id.* at 1441. *Spencer* is inapposite because it was construing the meaning of the term "employer" in a particular federal statute, 42 U.S.C. § 2000e. In contrast, here the court must examine state laws to determine the County's role in Vernon's employment decisions. *See Dotson,* 937 F.2d at 924. *Spencer* recognized that state laws would yield a different result: "Although state law is clear on the fact that the County is not the employer of a Sheriff's deputy, the question facing the Court is one of federal law." 899 F.Supp. at 1441. Therefore, Plaintiffs' Section 1983 claims against the County will be dismissed.

In addition, Plaintiffs' state law claims against the County will be dismissed. As the foregoing discussion indicates, the sheriff exercises autonomy in deciding whom to hire and fire. In *Peele v. Provident Mutual Life Insurance Co.,* the state court of appeals dismissed the county from a suit brought under state law for a sheriff's discharge of a dispatcher. 90 N.C.App. at 450, 368 S.E.2d at 894. The court ruled that the dispatcher was an employee of the sheriff and not of the county. *Id.* Therefore, these claims must be dismissed against the County.

## III. *Procedural Due Process*

Defendants move for summary judgment on Plaintiffs' claim that Defendants denied them property rights in their positions without due process of law. The court will dismiss this claim because Plaintiffs cannot show that they had constitutionally protected property interests in their continued employment.

To be entitled to the due process clause's safeguards, a plaintiff must have been deprived of liberty or property. *Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972); *Beckham v. Harris,* 756 F.2d 1032, 1036 (4th Cir.), *cert. denied,* 474 U.S. 903, 106 S.Ct. 232, 88 L.Ed.2d 231 (1985). "A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). The proper first question therefore is not whether the sheriff's department failed to follow certain procedures, but instead whether Plaintiffs were entitled to their jobs. *See Olim v. Wakinekona,* 461 U.S. 238, 250, 103 S.Ct. 1741, 1748, 75 L.Ed.2d 813 (1983) ("Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement."); *Garraghty v. Commonwealth of Va., Dep't of Corrections,* 52 F.3d 1274,

---

8. In the same way, this case is different from *Flood v. Hardy,* 868 F.Supp. 809 (E.D.N.C.1994), in which the court held that the county could be liable for the sheriff's decisions in keeping the county jail. *Id.* at 812–13.

1284 (4th Cir.1995). This is determined by reference to state law. *Bishop v. Wood,* 426 U.S. 341, 344 & n. 7, 96 S.Ct. 2074, 2077 & n. 7, 48 L.Ed.2d 684 (1976); *Garraghty,* 52 F.3d at 1279.

■ In North Carolina, employees are presumed to hold their jobs at will unless they have a contract for a specified term or a fixed duration. *Kristufek v. Saxonburg Ceramics, Inc.,* 901 F.Supp. 1018, 1023 (W.D.N.C.1994), *aff'd,* 60 F.3d 823 (4th Cir. 1995); *Harris v. Duke Power Co.,* 319 N.C. 627, 629, 356 S.E.2d 357, 359 (1987); *Rucker v. First Union Nat'l Bank,* 98 N.C.App. 100, 102, 389 S.E.2d 622, 624, *disc. review denied,* 326 N.C. 801, 393 S.E.2d 899 (1990). Moreover, the sheriff has the exclusive right to hire, fire, and discipline deputies. N.C.Gen. Stat. § 153A–103. Courts thus have recognized that a sheriff can discharge deputies with or without cause. *See Hughes,* 913 F.Supp. at 429; *Peele,* 90 N.C.App. at 451, 368 S.E.2d at 894–95. Therefore, deputies normally have no property interest in their jobs.

■ Plaintiffs assert that their property rights in their jobs flow from an employment manual. North Carolina courts are "clear" that " 'unilaterally promulgated employment manuals or policies do not become part of the employment contract unless expressly included in it.' " *Black v. Western Carolina Univ.,* 109 N.C.App. 209, 213, 426 S.E.2d 733, 736 (quoting *Walker v. Westinghouse Elec. Corp.,* 77 N.C.App. 253, 259, 335 S.E.2d 79, 83–84, *disc. review denied,* 315 N.C. 597, 341 S.E.2d 39 (1986)), *cert. denied,* 334 N.C. 433, 433 S.E.2d 173 (1993); *Rucker,* 98 N.C.App. at 103, 389 S.E.2d at 624–25. In this case, Plaintiffs allege that they were given the handbook shortly after their arrival, and Harter attended a seminar on the handbook. The handbook provides that employees cannot be discharged except for certain causes. Although the handbook does not unambiguously apply to the deputies, Vernon adopted the handbook for the depart-

ment in May 1984, before either Plaintiff began working for the department. However, Vernon never discussed the handbook with Plaintiffs, and Plaintiffs were never told explicitly that it was part of their employment contracts.

Similar cases have held that such handbooks cannot become part of an employment contract in North Carolina. *See Rosby v. General Baptist State Convention,* 91 N.C.App. 77, 81, 370 S.E.2d 605, 608, *disc. review denied,* 323 N.C. 626, 374 S.E.2d 590 (1988); *Buffaloe v. United Carolina Bank,* 89 N.C.App. 693, 696, 366 S.E.2d 918, 920 (1988); *Walker,* 77 N.C.App. at 259, 335 S.E.2d at 83–84. Therefore, they cannot form the basis of a property right. Further, in almost exactly the same situation, the Fourth Circuit held that an employee handbook did not give a deputy an entitlement to his job because Virginia law made clear that sheriff's deputies serve at the discretion of their sheriff. *Jenkins v. Weatherholtz,* 909 F.2d 105, 108–09 (4th Cir.1990). Thus, the court concludes that the handbook did not give Plaintiffs protectible property interests in their jobs.[9]

### IV. *First Amendment*

Plaintiffs claim that Vernon violated their First Amendment rights by firing them for their lukewarm support of Vernon's 1994 campaign. The court concludes that sufficient issues of fact exist for this claim to survive summary judgment. However, Vernon is entitled to qualified immunity from damages in his individual capacity.

■ The court's first consideration is which First Amendment test to apply. Plaintiffs maintain that the court should apply the test from the Supreme Court's political patronage cases: *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); and *Elrod v. Burns,* 427 U.S. 347, 96

---

**9.** Plaintiffs also assert that this personnel policy rose to the level of an ordinance that gave them a reasonable claim of entitlement to continued employment. However, there is no evidence that the policy was adopted with the formalities required to form the basis of a property interest.

*See Dunn v. Town of Emerald Isle,* 722 F.Supp. 1309, 1311 (E.D.N.C.1989), *aff'd,* 918 F.2d 955 (4th Cir.1990). Also, it seems doubtful that the county has the power to adopt an ordinance abrogating the sheriff's statutory power to discharge employees.

S.Ct. 2673, 49 L.Ed.2d 547 (1976). Vernon, on the other hand, claims that the court is governed by the Supreme Court's public employee speech cases: *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); and *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Courts have split on their analysis of cases such as this one, and much turns on the resolution of this question. *See generally* Jonathan Epstein, Comment, *You Have No Right to Remain Silent: The Strange Case of Elected Officials and Coerced Campaigning*, 1995 U. Chi. Legal F. 339.

In *Jones v. Dodson*, 727 F.2d 1329 (4th Cir.1984), the Fourth Circuit apparently adopted the *Pickering* line to govern cases of employee political neutrality. The court ruled that the patronage line applied narrowly to "discharges concededly based only upon the employees' party affiliations." *Id.* at 1334 n. 6. The court continued:

> We recognize that the principle might be thought to run as well to coerced political loyalty to individual employers (even of the same political party). The effect of such an extension of *Elrod–Branti* patronage discharge principles would be, however, necessarily to carry over to other discharges than those solely for party affiliation, the extremely narrow justification basis defined in *Branti*. We do not believe that test is suited to the "personal political loyalty" situation; it is too narrow.

*Id.* at 1334–35 n. 6 (citations omitted). The court thus consigned *Elrod, Branti,* and *Rutan* to cases of "raw political patronage (party affiliation alone)" and placed the bulk of cases dealing with "arguably protected 'expressive conduct' " under the *Pickering* line of cases. *Id.* at 1335. In this case, there was no "raw" patronage decision because Plaintiffs and Vernon belonged to the same party. Also, Plaintiffs allege that they engaged in overt speech. Therefore, the court will apply the *Pickering* test.

The court must first ask what "speech" Plaintiffs have allegedly made in this case. Payne gave Vernon a ten dollar campaign contribution. This is speech. *See* *Buckley v. Valeo,* 424 U.S. 1, 16, 96 S.Ct. 612, 633, 46 L.Ed.2d 659 (1976). Harter told Vernon that he supported him but would not campaign for him. This, too, is speech.

However, silence also can be speech that is eligible for First Amendment protection. *Wooley v. Maynard,* 430 U.S. 705, 717, 97 S.Ct. 1428, 1436, 51 L.Ed.2d 752 (1977); *Board of Educ. v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943). At this stage, Plaintiffs have sufficiently shown that their decisions not to put up campaign posters, not to attend campaign rallies, not to work the polls, and not to donate heavily to the campaign, are speech eligible for First Amendment protection.

The next step is the crucial one in this case. The court may protect this speech only if it may be "fairly characterized as constituting speech on a matter of public concern." *Connick,* 461 U.S. at 146, 103 S.Ct. at 1689. Vernon maintains that Plaintiffs did not speak on a matter of public concern because they did not widely communicate their neutrality to the public. The court rejects that position. It is true that whether speech is a matter of public concern "must be determined by the content, form, and context" of that speech. *Id.* at 147–48, 103 S.Ct. at 1690. The "content, form, and context" inquiry is intended to help the court make the key distinction between speech "as a citizen upon matter of public concern" versus speech "as an employee upon matters only of personal interest." *See id.* at 147, 103 S.Ct. at 1690. In this determination, the "context" of the speech is not dispositive; just because a matter is not broadcast to the world does not make it of only private concern. *See Rankin,* 483 U.S. at 386 n. 11, 107 S.Ct. at 2898 n. 11 (statement to coworker/boyfriend in private is on matter of public concern); *Jones,* 727 F.2d at 1334 (statement on matter of public concern can be made in private conversation). The test instead focuses on content. *Arvinger v. Mayor & City Council of Baltimore,* 862 F.2d 75, 79 (4th Cir.1988).

Speech on matters of government and elections is at the heart of the First Amendment's protection. *See Abood v. De-*

troit Bd. of Educ., 431 U.S. 209, 231, 97 S.Ct. 1782, 1797, 52 L.Ed.2d 261 (1977). Here, Payne's donation and Harter's stated refusal to work for Vernon's campaign are instances of speech on a matter of public concern. Further, Plaintiffs were also speaking on a matter of public concern by their silent refusal to promote or finance his campaign. *See Langford v. Lane,* 921 F.2d 677, 680–81 (6th Cir.1991) (holding that employee could be speaking on a matter of public concern by refusing to talk with a supervisor about a problem); *Sykes v. McDowell,* 786 F.2d 1098, 1104 (11th Cir.1986) (ruling that deputy engaged in protected speech by refusing to support the sheriff); *Brown v. Reardon,* 770 F.2d 896, 903 (10th Cir.1985) (suggesting that plaintiffs could prove that deciding not to buy tickets to a fund-raiser could be protected speech); *Lindahl v. Bartolomei,* 618 F.Supp. 981, 990 n. 7 (N.D.Ind.1985) (holding that there is a right to remain neutral in politics and other speech). *But see Aspinwall v. Herrin,* 879 F.Supp. 1227, 1238 (S.D.Ga.1994) (holding that silent political neutrality is not speech on a matter of public concern).

Vernon has cited *Olivo v. Mapp,* 57 F.3d 1067 (table), 1995 WL 339049 (4th Cir.) (per curiam), *cert. denied,* — U.S. —, 116 S.Ct. 673, 133 L.Ed.2d 522 (1995), for the proposition that a deputy's neutrality in his sheriff's campaign is not speech on a matter of public concern. In that case, the panel held that a deputy was communicating merely a private concern when he did not buy a ticket to a fundraiser and expressed disapproval of it, did not contribute to the campaign, and expressed his neutrality in the election. *Id.* at *3. The panel found that the speech was "more aptly characterized as an expression of frustration over being asked to pay forty dollars for a crab feast." *Id.* Vernon contends that this situation is analogous.

 The court hesitates to counter one unpublished per curiam opinion with another, but *Orga v. Williams,* 68 F.3d 460 (table), 1995 WL 592241 (4th Cir. Oct. 6, 1995) (per curiam), demonstrates that a deputy's neu-

trality in a sheriff's election can be speech on a matter of public concern. In *Orga,* the court concluded that the deputies engaged in speech on a matter of public concern when they refused to support the sheriff actively. *Id.* at *4.[10] By comparing these cases, it becomes apparent that the court must engage in a fact-specific determination when it decides whether neutrality is speech on a matter of public concern or not. In this case, unlike *Olivo,* there is insufficient evidence at this stage to lead the court to conclude that Plaintiffs were merely expressing personal concerns when they communicated their neutrality, both overtly and silently.

 Once the speech is characterized as a matter of public concern, Vernon can still escape liability in either of two ways. First, Vernon can show that the speech did not cause the terminations. If Plaintiffs meet their burden of showing that the speech was a motivating factor in the decision, the burden shifts to Vernon to prove that he would have fired Plaintiffs even without the speech. *Hall v. Marion Sch. Dist. No. 2,* 31 F.3d 183, 194 (4th Cir.1994). This is a factual issue. *Id.*

 Plaintiffs' case is based on circumstantial evidence; however, a jury could reasonably conclude that Vernon fired them because of their speech. Seven employees were all fired on one day after a campaign in which there was on-the-job pressure to support Vernon. Of the other five (aside from Plaintiffs), two quietly supported Vernon's main opponent, and three were rumored to support the opponent. Vernon allegedly threatened to fire two of those employees if they did not campaign for him.

A genuine issue of material fact also exists on whether Vernon's purported reasons for firing Plaintiffs were pretextual. Vernon claims that he fired Payne for going to the Sanitary Cafe on breaks without checking out on the radio. However, five deputies did the same thing and only two were fired. Vernon claims that he fired Harter because he was unprofessional over the radio; howev-

---

**10.** The court wrote: "[The plaintiffs] alleged that they were terminated because they had not supported [the sheriff's] candidacy and because they had been suspected of supporting his rivals. We

agree with the district court that their political speech in the context of an election for sheriff involved a matter of public concern." *Orga,* 1995 WL 592241, at *4.

er, Harter's comments were not so objectionable as to make it unreasonable for a jury to find that Vernon did not fire Harter for that reason.

In sum, there are genuine issues of material fact as to Vernon's motivation for firing Plaintiffs. Therefore, Vernon has not justified summary judgment on this ground.

■■■■ Vernon has a second chance to escape liability. A public employee's speech is unprotected if the employee's interest in the speech is outweighed by the public employer's "interest in effective and efficient fulfillment of its responsibilities to the public." *Connick,* 461 U.S. at 150, 103 S.Ct. at 1691. The employer may show that his interests may be hampered when an employee's speech might disrupt the office, undermine authority, or destroy close working relationships. *See id.* at 154, 103 S.Ct. at 1693. Balancing the interests is a question of law on which Vernon bears the burden of persuasion. *Jones,* 727 F.2d at 1334. Vernon has not yet met his burden.

■■■ Vernon argues in his brief that the discipline and loyalty demanded of law enforcement officers require that he have people that he can trust below him. However, the need for efficiency in a law enforcement setting does not *per se* override employees' interest in speaking on matters of public concern. *See Kincade v. City of Blue Springs, Mo.,* 64 F.3d 389, 398 (8th Cir.1995), *petition for cert. filed,* 64 U.S.L.W. 3503 (U.S. Jan. 10, 1996) (No. 95–1119); *Bieluch v. Sullivan,* 999 F.2d 666, 671–72 (2d Cir.1993), *cert. denied,* 510 U.S. 1094, 114 S.Ct. 926, 127 L.Ed.2d 219 (1994). Vernon brings forth insufficient evidence that, in this case, he reasonably could have apprehended that Plaintiffs' speech would hamper his operations. At this stage, Vernon thus has not persuaded the court that he is entitled to have the *Pickering* balancing test come out in his favor.

■■■ In sum, the court finds that Plaintiffs have shown that their speech was on a matter of public concern. Plaintiffs also have created a genuine issue of material fact on whether this speech was a motivating factor in their firing. Vernon has not countered with a sufficient showing at this point that either (1) he would have fired Plaintiffs even without their speech, or (2) his interest in efficiency outweighed Plaintiffs' interest in speech. Therefore, summary judgment as to the substantive claim is inappropriate.[11]

■■■ The court, however, will grant qualified immunity to Vernon in his individual capacity. Government actors are entitled to qualified immunity from civil damages for doing their jobs "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). For a right to be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). *See Pinder v. Johnson,* 54 F.3d 1169, 1173 (4th Cir.) (holding that the rights must be clearly established in a particularized sense), *cert. denied,* —— U.S. ——, 116 S.Ct. 530, 133 L.Ed.2d 436 (1995). Qualified immunity must be allowed unless "in the light of pre-existing law the unlawfulness [was] apparent." *DiMeglio v. Haines,* 45 F.3d 790, 803 (4th Cir.1995). *See Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) (noting that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."); *Maciariello v. Sumner,* 973 F.2d 295, 298 (4th Cir.1992) ("[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines."), *cert. denied,* 506 U.S. 1080, 113 S.Ct. 1048, 122 L.Ed.2d 356 (1993). "This tolerance for a range of reasonable public actions is particularly important for those who must interpret often imprecise or incomplete legal precedent."

---

**11.** The standards under the First Amendment are the same as those for Article I, Section 14 of the North Carolina Constitution. *See Lenzer v. Flaherty,* 106 N.C.App. 496, 515, 418 S.E.2d 276, 287–88, *disc. review denied,* 332 N.C. 345, 421 S.E.2d 348 (1992). The court thus will deny Vernon's motion for summary judgment on Plaintiffs' state constitutional claim.

*Swanson v. Powers,* 937 F.2d 965, 968 (4th Cir.1991), *cert. denied,* 502 U.S. 1031, 112 S.Ct. 871, 116 L.Ed.2d 777 (1992).

There is sometimes a thin line separating speech on public concerns, speech on private concerns, and conduct that is not speech at all. This is true because whether something is speech on a matter of public concern is determined by its content, form, and context on the whole record. *See Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690–91. This is often a complex inquiry that is not easily done by employers. *Cf. DiMeglio,* 45 F.3d at 806 (noting that it seldom will be "clearly established" that employee speech is protected); *Lawrenz v. James,* 852 F.Supp. 986, 991 (M.D.Fla.1994) (describing the many considerations in this inquiry), *aff'd,* 46 F.3d 70 (11th Cir.1995).

The Fourth Circuit has not clearly illuminated the path of public employers dealing with politically neutral employees. *Joyner v. Lancaster,* 815 F.2d 20 (4th Cir.), *cert. denied,* 484 U.S. 830, 108 S.Ct. 102, 98 L.Ed.2d 62 (1987), which concerned a deputy who campaigned against the sheriff, established that a sheriff could fire certain employees for their political speech. However, it did not clearly establish that a sheriff could not fire politically neutral employees.[12] The parties have not pointed out a case prior to May 1994 in which a controlling court had ruled on the constitutionality of a discharge of a politically neutral employee. Other courts in 1994 were split on similar factual patterns. *Compare Sykes,* 786 F.2d at 1104 (holding that neutral employee engaged in protected First Amendment activity) *with Dimmig v. Wahl,* 983 F.2d 86, 87 (7th Cir.) (holding that

First Amendment did not protect neutral employee), *cert. denied,* 510 U.S. 861, 114 S.Ct. 176, 126 L.Ed.2d 135 (1993).

Since the Plaintiffs' discharge, the Fourth Circuit has handed down the unpublished, per curiam opinions in *Olivo* and *Orga.* These decisions reached different conclusions about the nature of similar speech by neutral deputies. Two of the circuit's panels apparently saw the slight factual distinction between the cases, but this court does not expect that a public employer acting in good faith could see the difference so readily. The court, therefore, will grant Vernon qualified immunity in his individual capacity on the First Amendment claim because the contours of Plaintiffs' rights were not clearly established.

## V. *Wrongful Discharge*

▮▮▮▮ Plaintiffs' final claim is that Vernon wrongfully discharged them in violation of public policy. Plaintiffs claim that they were protected by the policy in North Carolina General Statutes Section 153A–99 (Supp.1995). This statute protects a "county employee" from coerced political activity. *Id.* After the parties filed their briefs, Section 153A–99 was interpreted for the first time. *Vereen v. Holden,* 121 N.C.App. 779, 468 S.E.2d 471 (1996). The state court of appeals held that the statute can form the basis for a wrongful discharge claim. *Id.* at 783, 468 S.E.2d at 474. In light of *Vereen,* the parties should more carefully examine the question of whether such a claim can be made against Vernon in this case. The court, therefore, will withhold its judgment on this claim until trial.[13]

---

**12.** The Fourth Circuit's qualified immunity discussion in *Orga* is on-point:

[W]e conclude that the right asserted by [the deputies] had not been clearly established by Fourth Circuit case law. In *Joyner,* we affirmed the dismissal of the senior captain of a North Carolina sheriff's department because he actively campaigned for the sheriff's opponent. Although the plaintiff in *Joyner* had an important, supervisory role, his campaigning caused major disruptions, and he was acting in part for personal gain, we find that it would have been reasonable for [the sheriff] to rely on *Joyner* despite these distinctions. *Joyner* clearly established that a sheriff could terminate certain employees for their political speech

and did not clearly establish that sheriffs could not terminate nonsupervisory employees who did not cause disruptions and who did not act for personal gain.

*Orga,* 1995 WL 592241, at *6 (citations omitted).

**13.** Defendants also assert that Vernon is entitled to state sovereign immunity on this claim. The court will not dismiss the claim now on this basis. Sheriffs have sovereign immunity from recovery on their bond unless plaintiffs join the surety. *Messick,* 110 N.C.App. at 715, 431 S.E.2d at 494. However, plaintiffs can move to join the surety. *Id.* Further, immunity is waived to the extent that a county's insurance covers the sheriff. *Smith,* 117 N.C.App. at 383, 451 S.E.2d

## CONCLUSION

The court will grant Defendants' motion for summary judgment in part. All claims against the County will be dismissed. Plaintiffs' due process claim will be dismissed. While the court will deny the motion for summary judgment on Plaintiffs' First Amendment claim, Vernon will receive qualified immunity in his individual capacity on that claim. Finally, the court will withhold judgment on the state wrongful discharge claim.

An order and judgment in accordance with this memorandum opinion shall be entered contemporaneously herewith.

at 314. The parties have not fully addressed the issue of insurance coverage.