Scott CARTER, Plaintiff,

v.

Daniel J. GOOD, individually and in his official capacity as Sheriff of Rutherford County; and Aetna Life & Casualty Company, Surety, Defendants.

Civil No. 4:94CV200.

United States District Court,
W.D. North Carolina.
Shelby Division.

June 7, 1996.

Anita S. Hodgkiss, C. Margaret Errington, Ferguson, Stein, Wallas, Gresham & Sumter, P.A., Charlotte, NC, for plaintiff.

G. Michael Barnhill, W. Clark Goodman, Womble, Carlyle, Sandridge & Rice, Charlotte, NC, for defendants.

## MEMORANDUM OF OPINION AND ORDER

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the Defendants' motion for summary judgment and to strike an affidavit submitted by Plaintiff in opposition thereto. For the reasons stated below, the motion to strike is granted and the motion for summary judgment is denied.

## I. STANDARD OF REVIEW

A motion for summary judgment is appropriate in any civil action in which there is no genuine issue of material fact and judgment as a matter of law is warranted for one party. **Fed.R.Civ.P. 56(c).** A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party, here the Plaintiff. *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).

In ruling on the pending motion, the district court must construe the facts and draw inferences in the light most favorable to the plaintiff. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *on remand In re Japanese Electronic Products Antitrust Litigation,* 807 F.2d 44 (3d Cir.1986), *cert. denied, Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 481 U.S. 1029, 107 S.Ct. 1955, 95 L.Ed.2d 527 (1987). Defendants have the initial burden of pointing out an absence of facts, combinations of facts or evidence to support the Plaintiffs case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). However, if that is accomplished, Plaintiff must then demonstrate the existence of a triable issue of fact, a burden not met by a mere scintilla of evidence. *Stroud, supra.*

## II. FACTUAL BACKGROUND

Plaintiff Scott Carter (Carter) was first employed with the Rutherford County Sheriff's Department (Department) as a road deputy in April 1990. The Sheriff at that time was Ed Searcy and the Chief Deputy was John Smart, Jr. (Smart), both of whom were Democrats. In the fall of 1990, Daniel Good (Good), a Republican, won the election and took office as Sheriff. Good did not discharge Smart but moved him into the position of captain of the road deputies. As such, Smart became Carter's supervisor. Good named Floyd Laughter (Laughter) as his Chief Deputy. Carter continued as a road deputy under Smart's supervision and in July 1993, was promoted by Good to the position

of corporal. Sheriff Good came up for re-election in 1994. In November 1993, Smart announced his plans to run as the Democratic candidate. As a result, Smart resigned from his position in accordance with departmental policy. Carter was terminated from employment in March 1994.

Beyond these facts, the parties do not agree. Carter maintains he was discharged for exercising his free speech right to campaign and vote for Smart; Defendants maintain Carter was terminated for insubordinate conduct. Thus, in keeping with the standard of review for summary judgment, the Court sets forth the remaining facts in the light most favorable to the Plaintiff.

An understanding of the structure of the Sheriff's Department is necessary to the factual context. Directly beneath Sheriff Good in the chain of command was Chief Deputy Laughter. Deposition of Sheriff Daniel J. Good, at 19. Smart was the third in command as captain of the road department. *Id.* Underneath him were five road sergeants, each in charge of a different shift. *Id.,* at 21. Next came the lieutenant of detectives, Captain Gee, who supervised that division, a sergeant in charge of the jail, and a sergeant in charge of the DARE program. *Id.,* at 20, 21, 28. The rank below sergeant was that of corporal. *Id.,* at 24. When a regular road deputy was promoted to the position of corporal, he did not receive any additional income or responsibilities except when the sergeant was not available on a shift. *Id.,* at 24–5. At that time, he had to function in the same capacity as the sergeant for that shift. *Id.* Until early in 1994, Carter was a corporal in the road division which meant he functioned as a road deputy unless the night shift sergeant was off-duty.

In developing and implementing policies as sheriff, Good took information and advice from Laughter, Smart, and Gee. *Id.,* at 31–32. One policy which was reduced to writing involved political activities of members of the Department who were "permitted to support the political party of their choice when they are off-duty. At no time will officers engage in any political activity when they are on-duty, in uniform or while operating an assigned or non-assigned county owned vehicle." Exhibit 1, Policy on Political Activity, *attached to* Good Deposition. As will be noted later, Sheriff Good construed this policy to mean that an off-duty deputy could not communicate about the upcoming election with an on-duty deputy. In addition, Plaintiff claims that while this was the official policy, the Sheriff made it clear to his Department that no one should support any candidate other than him.

In view of the upcoming campaign for sheriff, Good met with employees of the department in November 1993, to

> make sure that they understood several things about the upcoming campaign at that time, one of which was to make sure that they understood that they were under no obligation whatsoever to vote for me, they were under no obligation to provide me with political contributions, that they could support the person that they so chose to support, provided that while they were on duty, as such, that they were considered to be—I expected them to be loyal to this department and to do their job as an unbiased police officer would the job.

Good Deposition, at 40–41. Members of the Department report that what Good meant by being "loyal" was the forbidding of any political activity, whether on or off duty, unless it was in support of Good. **Affidavit of John Smart, Jr., dated March 29, 1996, at 3, *attached to* Plaintiff's Memorandum in Opposition to Summary Judgment; Affidavit of John Smart, III, at 2–3; Transcript of Recorded Conversation between Sheriff Good and John Smart, III, at 5 ("Again, all you gotta do is do what you're doing and stay out of overt, I mean, you know politics that means working on anyone's campaign. You don't have to work on mine, but you know, by the same token you can't work on anybody else's.")** [1]; Deposition of Scott Carter at 78. At the above-described meeting, Chief Deputy Laughter solicited campaign contributions from on-duty employees after Good left the room. Carter Deposition at 78. Moreover, on at least one occa-

---

1. Defendants moved to strike the affidavit of James Butler attached to the Memorandum in Opposition but did not oppose the consideration of this transcript.

sion, Chief Laughter contributed money to Good's campaign while on-duty when he was approached by other deputies. Deposition of Floyd A. Laughter, at 52, *attached to* Defendant's Memorandum in Support of Motion for Summary Judgment. On another occasion, deputies got together during the changing of shifts, while some were on-duty, to take up money to rent a billboard to support Good's campaign. Deposition of Donald R. Huckabee, at 84, *attached to* Defendant's Memorandum.

Carter's father-in-law, Robert Jones, was a close friend and ardent supporter of Smart in his campaign for sheriff. Carter claims Good assumed he would know about Smart's plan to run for election from his father-in-law. Thus, Good tried to obtain information from Carter about Smart's intentions. Carter Deposition, at 32–33. During one meeting, Good told Carter that he would be fired if he campaigned for Smart. *Id.* Carter told Smart about this meeting. *Id.*, at 35.

Good called another meeting with Carter at which Captain Gee and Chief Deputy Laughter were present and during which Carter was accused of interfering with an informant in a federal drug investigation. *Id.*, at 41. Carter explained that he was friends with the narcotics officer involved with the case and simply assisted that officer in selling a Christmas tree to the informant. *Id.*, at 41–42.

Apparently as a result of the above, Good met with Carter in February 1994, to advise he was being transferred to the jail. *Id.*, at 36–37. While Good did not say the "assignment" was permanent, in the interim Carter would not be a road deputy although his rank as corporal was not changed. *Id.*, at 36–37. During this meeting, Carter told Good he was supporting Smart "100 percent". *Id.*

On March 4, 1994, Carter, who was off-duty, and a friend went to the Pizza Hut in Forest City, North Carolina, after a ballgame. *Id.*, at 58. While there, he saw Officers Huckabee, Guffey, Parker, and Scoggins, all of whom were on-duty. *Id.* Officer Huckabee approached Carter at the table and asked him how he was doing, saying he was sorry Carter had been transferred to the jail. *Id.*, at 59. Carter's friend handed Huckabee a political brochure for Smart which Huckabee threw back on the table.[2] *Id.*, at 60. Carter told Huckabee that he had been the only deputy strong enough to stand up to Good by telling him whom he supported for sheriff. *Id.*, at 59. During this encounter, Carter was wearing a "John Smart for Sheriff" hat. *Id.*, at 63. Huckabee reported the incident to Good; and on March 8, 1994, Carter was telephoned by Laughter and told his services with the department were no longer needed. *Id.*, at 65.

According to Sheriff Good, the Pizza Hut incident was the event which precipitated Carter's termination. Good Deposition, at 100. After Smart resigned to campaign for office, Sergeant Huckabee complained to Good that Carter had often gone over his head to Smart when he did not agree with assignments, etc.[3] *Id.*, at 52. On another occasion, Huckabee told Carter to serve a warrant on Lena Tipton; but, Carter instead called her and told her to come into the station for service.[4] *Id.*, at 64. Despite the fact that Tipton did come in, Huckabee considered Carter's conduct to be insubordination because Carter did not tell him Tipton's location. Huckabee Deposition, at 24–25.

Later, Tipton was involved in another incident stemming from an argument with Trudy Lebrun who called 911 asking the sheriffs to

---

**2.** Officer Scoggins provided an affidavit stating that Carter actually slid the campaign literature to Officer Guffey. Affidavit of Billy Scoggins, at 1, *attached to* Defendants' Memorandum in Support of Summary Judgment. Officer Guffey attested to the same facts. Affidavit of Wayne Guffey, at 1, *attached to* Defendants' Memorandum. Officer Huckabee testified at his deposition that when he walked over to Carter's table, Carter's friend slid some literature to him. Huckabee Deposition, at 49. Huckabee did not state he saw Carter give literature to Guffey but testified, "And when I walked up, Scott *had* slid

a card to Wayne Guffey ...". *Id.* (emphasis added).

**3.** Although Smart as captain of the road deputies was Carter's supervisor, Huckabee was his direct supervisor.

**4.** No date was given for this incident; but, as with all the examples of insubordination, it appears to have occurred after Smart announced his candidacy in November 1993.

arrest Tipton at a certain location. The call was assigned to Carter but as he drove up, so did the complainant who proceeded to get out of her car and become embroiled in a physical altercation with Tipton. Exhibit N, Statement of Scott Carter, *attached to* Plaintiff's Opposition to Summary Judgment. While Carter held Tipton, Lebrun came after her and Carter kicked Lebrun to get her away. *Id.* Lebrun then left in her car and filed a complaint against Carter. *Id.*

Finally, Good testified that *after* he had terminated Carter, he heard rumors that Carter had "fixed" a driving while impaired charge in return for a contribution to Smart's campaign. Good Deposition, at 116–18. Carter, however, attached the affidavit of Larry Owens, the charged individual, who averred that Carter did nothing of the sort. Affidavit of Larry Owens, *attached to* Plaintiff's Opposition to Summary Judgment.

Good testified the Pizza Hut incident was the "straw that broke the camel's back." Good Deposition, at 100. That, in combination with the above, "was just enough for me to terminate Mr. Carter, and I no longer needed his services." *Id.* However, in response to a question of whether he was planning to terminate Carter prior to the Pizza Hut matter, Good stated

> I was seriously contemplating what to do with Mr. Carter, even after I offered him the chance to work at the jail. I hadn't made my mind up completely, but I was going to give him a chance to work at the jail. . . .

> If the incident at the Pizza Hut had not happened, would you have still fired him? . . .

> I don't know. I think it would have depended on Corporal Carter's conduct in

the jail and from what happened, how he did his job.

*Id.,* at 100–01.

Smart's son, John Smart, III, and his nephew, Mark Duncan, were deputy sheriffs under Good during the campaign. They secretly taperecorded a conversation with Sheriff Good in which he told them that as long as they did their jobs and did not campaign for his opponent, they would not be fired.[5] Neither officer was fired and Duncan is still employed by Good.

## III. DISCUSSION

### A. Discharge in retaliation for the exercise of free speech.

The parties agree that this is not a case of "raw political patronage" and thus, the case need not be analyzed under the Supreme Court's trilogy of *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); and *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). The Court agrees.

Plaintiff's action is brought pursuant to 42 U.S.C. § 1983. In order to state a cause of action thereunder, a plaintiff must show (1) the deprivation of a right secured by the Constitution or a federal statute (2) by a "person" (3) acting under color of state law. *Conner v. Donnelly,* 42 F.3d 220, 223 (4th Cir.1994). Plaintiff claims he was discharged in retaliation for his exercise of free speech. Thus, the first element to consider is whether, accepting Plaintiff's version of the facts, (1) telling Good he supported Smart "100 percent;" (2) wearing a "Elect John Smart Sheriff" hat;[6] and (3) telling on-duty officers that he was the only deputy strong enough to stand up to Good are free speech.

---

5. Defendants have attached an affidavit from Duncan in which he states that his interpretation of Good's comments was that as long as they did not do campaigning while on duty, they would not be fired. Duncan is still employed by Good. On this motion for summary judgment, the Court is bound by the transcript of the taperecording which John Smart, III, has averred as being an accurate and true reflection of the contents of the

recording. Defendants have not objected to the accuracy of the transcript.

6. For purposes of the motion, the Court accepts the Plaintiff's version of the facts of the Pizza Hut incident; i.e., that he did not hand anyone political literature.

A "state government entity may not deprive a person of valuable employment benefits in retaliation for that person's exercise of his first amendment rights." *Wagner v. Wheeler*, 13 F.3d 86, 90 (4th Cir.1993). The Fourth Circuit has developed a three-pronged test in such cases: (1) that the employee engaged in speech on a matter of public concern; (2) the retaliatory action deprived the employee of a valuable benefit which is not outweighed by the interests of the governmental entity in lack of disruption of its operations; and (3) "but for" the protected expression, the employer would not have taken retaliatory action. *Id.; Holland v. Rimmer*, 25 F.3d 1251, 1254–55 (4th Cir. 1994); *Jones v. Dodson*, 727 F.2d 1329, 1334–35 (4th Cir.1984). "Whether a particular expression was, in the first place, upon a matter of legitimate public concern is a question of law for the courts, it is not a question of fact." *Id.*, at 1334.

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983).

> When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.

*Id.*, at 146–47, 103 S.Ct. at 1690. In other words, if the community at large would not be interested in the expression or it is a private matter between employer and employee, the expression is not public. *Holland*, 25 F.3d at 1255.

Carter's first expression was his acknowledgement to Sheriff Good of his support of Smart's campaign for sheriff during a meeting with Good, Captain Gee and Chief Deputy Laughter. Considering the record as a whole, by this time Carter had been told at least once not to support Smart's campaign or he would lose his job. During this meeting, he was transferred into a position which he considered to be punishment for such support, although predicated on what he deemed to be trumped up allegations that he had interfered in a federal drug investigation. It was then that he determined to "go for broke" and told the sheriff who he was supporting in the election. "Speech on matters of public concern is protected even though it occurs in a private setting." *Maciariello v. Sumner*, 973 F.2d 295, 299 (4th Cir.1992) **(holding investigative conduct of officers into allegations that another officer had altered evidence was protected conduct although done with a personal motive to impugn the officer).** Statements made in private to an employer concerning the employer's policy in contravention of his employees' right to campaign and vote for the candidate of their choice involve matters of public concern. *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689–90.[7]

Next, it is clear that Carter's wearing of the hat in support of a different candidate is an expression of public concern in the most elementary sense. Likewise, his statement to other officers that he was stronger than they because he dared defy the sheriff in order to support the political candidate of his choice is certainly a matter of public concern. It directly confronted an employer's policy of terminating those deputies who supported a different candidate.

7. The Court finds the Defendants' citation to the unpublished case of *Olivo v. Mapp*, 1995 WL 339049 (4th Cir.1995), inapposite. When asked to contribute to the sheriff's all you can eat and drink beer and crab feast to raise campaign funds, Olivo responded that it interfered with his Christian beliefs and encouraged deputies to drink and drive. He was moved into a different position as a form of "punishment" for not contributing to the campaign, but the court found his speech was an expression of private frustration at being asked to contribute rather than a means by which to bring the practice to public attention. Thus, it was found private, not public, expression. Here, Carter's words are more akin to the conduct of the officers in *Maciariello*. His private statement to the sheriff that the unstated policy against campaigning for any other candidate would be defied was a matter of public concern which he proceeded to make public through later actions.

■ Defendants attempt to distinguish the last statement because it was made to on-duty officers, noting the written policy against campaigning by an officer while on duty. First, for purposes of the motion for summary judgment, the Court accepts Plaintiff's position, corroborated by Officer Huckabee, that he did not distribute any literature but merely responded to Huckabee's expression of condolence. The fact that such a comment was made to an officer who was on-duty in response to a conversation initiated by that on-duty officer removes any defense that Carter breached the written policy.

■ This Court therefore finds as a matter of law that the expression in question was protected speech. The next inquiry is whether Carter's interest in free speech is outweighed by the sheriff's interest in the smooth operation of his department during an election year.[8]

> Resolution of this question requires striking the proper constitutional balance between the opposing interests, and this in turn requires weighing the degree of "public concern" legitimately had in the particular expression of ideas-as measured by the expression's content and context-against the degree to which the employee's conduct is justifiably viewed by the public employer as an actual or threatened disruption of the conduct of government operations for which the employer is responsible.... [E]xpressive conduct, concededly disruptive to some degree, which touches directly upon matters of grave public concern may not justify another discharge.... In making this balancing inquiry, the burden is upon the public employer to convince the court that the balance tips in favor of the governmental interest.

*Jones,* 727 F.2d at 1334. When the employee's speech involves matters of public concern, as here, the governmental entity "must make a stronger showing of disruption in order to prevail." *Hall v. Marion Sch. Dist. No. 2,* 31 F.3d 183, 195 (4th Cir.1994).

The only disruption Defendants' claim stems from the Pizza Hut incident. Defendants argue that Carter breached the written policy against campaigning on duty by discussing politics with on-duty officers. However, as noted above, the Court has found, for purposes of this motion, that Carter did not breach the policy, did not distribute campaign literature, and merely responded to an inquiry from Huckabee.

Moreover, despite the Defendants' generalization that Carter was in a position of authority and policymaking, Good's deposition shows otherwise. It appears that a corporal's job was the same as that of a road deputy except when the night-shift sergeant was off-duty. And, even then, the captain was on call for consultation. It is therefore highly unlikely that Carter would have been in a position to actually disrupt Good's policy.

Indeed, the only disruption within the Department appears to have been caused by Good's announced policy that no employee could support another candidate. In this regard, the Defendant's evidence is telling. Good testified that Captain Gee told him John Smart, III, and Mark Duncan, Smart's son and nephew, were concerned for their jobs.

> [T]hey both told Captain Gee that they had been hearing rumors and gossip and words from others that worked in this department that they should be afraid of their job, that they should be concerned that I was going to fire them.

*Good Deposition,* at 111. Thus, the son and nephew of the candidate opposing Good were concerned they would lose their jobs precisely because of their support of a different candidate.

Moreover, when asked why he terminated Brenda Peeler after his election, Good replied

> I simply told her that I no longer needed her services, and this—as a result of having won the election again, that it was my right, as I saw it and as I looked at the statute, that it was my right not to retain her services.

---

**8.** Carter's interest in continued employment was a valuable benefit although he had no vested tenure in his job. *Huang v. Board of Governors*

*of University of N.C.,* 902 F.2d 1134, 1139–40 (4th Cir.1990) (citing *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)).

Good, at 133. Sheriff Good denied that he terminated Peeler because she did not contribute to his campaign. He also denied terminating Deputy May for the same reason. *Id.*, at 134. Good also testified that he removed Reserve Deputy Jim Butler from active to inactive status after he heard rumors that Butler was campaigning for Smart, both on and off duty. *Id.*, at 136–37. In addition, despite the allegation that Carter's conduct made other officers uncomfortable, it appears that other officers of the Department campaigned while off-duty and contacted on-duty officers in the process. Huckabee Deposition, at 84; Laughter Deposition, at 52. Thus, the conduct of the Sheriff and his own officers caused the disruption. The Court finds as a matter of law that Carter had an interest in a valuable benefit and that his interest was not outweighed by the potential disruption to the Sheriff's Department caused by his free speech.

The third prong of the cause of action is whether Carter would have been discharged "but for" his free speech. The resolution of this issue "depends on the identification of what was the cause of the employee's discharge or demotion." *Jurgensen v. Fairfax County, Va.*, 745 F.2d 868, 880–81 (4th Cir.1984). "[N]otwithstanding proof (or concession) that a public employee's discharge was based at least in part upon overt expressive conduct, ... an employer may yet avoid liability for violation of protected first amendment rights by proving that the discharge would have been made in any event for reasons unrelated to any exercise of protected first amendment rights. The burden to prove this avoidance defense is upon the public employer." *Jones*, 727 F.2d at 1335 (citing *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)).

Good claims he had been considering Carter's termination prior to the protected speech issues. Laughter had previously recommended termination based on the incidents described above as insubordination and interference with a federal drug investigation. Laughter Deposition, at 28–30. Good testified that he was unsure whether or not he would have fired Carter if the Pizza Hut

incident had not occurred. Good Deposition, at 101. Thus, Defendants have not carried their burden of showing that discharge would have occurred despite the protected speech. In such a scenario, summary judgment is inappropriate. *Jones*, 727 F.2d at 1337 (**"where, as here, the evidence raises genuine issues as to the actual reason for an employee's discharge, that motivational issue must of course be resolved by the trier of fact"**); *see also, Brawner v. City of Richardson, Tex.*, 855 F.2d 187, 193 (5th Cir.1988) (whether the police officer was discharged for protected speech or for insubordination was a genuinely disputed issue prohibiting summary judgment and warranting submission to a jury); *accord Fowler v. Smith*, 68 F.3d 124, 127 (5th Cir.1995); *Bisbee v. Bey*, 39 F.3d 1096, 1100–01 (10th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2577, 132 L.Ed.2d 827 (1995) ("Questions concerning whom to believe in this matter are reserved for the jury."). **The Court therefore finds that summary judgment is inappropriate.**

**B.  Sheriff Good's status as a person under § 1983 and Eleventh Amendment immunity.**

Defendants argue that Sheriff Good is not a person capable of being sued under § 1983 because North Carolina law holds that a sheriff is a state rather than local official. However, in a § 1983 action, state law only determines the capacity of a governmental body to be sued in the federal courts, not whether that body qualifies as a "person" subject to suit under the statute. Fed.R.Civ.P. 17(b); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 484, 106 S.Ct. 1292, 1300–01, 89 L.Ed.2d 452 (1986); *Avery v. Burke County*, 660 F.2d 111, 113–14 (4th Cir.1981); *Jenkins v. Medford*, Civil No. 1:95cv126, 1995 WL 914528 (W.D.N.C. April 18, 1996).

The Supreme Court long ago established that local governing bodies and their officials may be sued directly under § 1983. *Monell v. Dept. of Soc. Serv. of City of N.Y.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). And, whether or not a local governmental body is a "person" for § 1983 purposes is a matter of federal, not state, law. *Will v. Michigan Dept. of State*

*Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). The Supreme Court in *Will* also held that state agencies and state officials acting in their official capacities are not persons under § 1983 when the remedy sought is monetary damages, although they are persons for purposes of injunctive relief. *Id.* The Defendants' argument that a sheriff and his deputies are state officials and thus not persons under § 1983 disregards a plethora of case law, none of which contains a determination that a sheriff is not a person for purposes of suit under § 1983. *See, e.g., Price v. Sasser,* 65 F.3d 342 (4th Cir.1995) **(North Carolina sheriff and his deputies sued pursuant to § 1983 but case dismissed on summary judgment because no factual issue shown of constitutional deprivation);** *accord, Gordon v. Kidd,* 971 F.2d 1087 (4th Cir.1992) (also involving a North Carolina sheriff); *Taft v. Vines,* 70 F.3d 304 (4th Cir.1995), *vacated* Jan. 4, 1996, *aff'd,* 83 F.3d 681 (4th Cir.1996) **(North Carolina sheriff and deputies sued under § 1983 but denied qualified immunity; opinion vacated on issue of qualified immunity; after *en banc* rehearing, officers granted qualified immunity);** *Gray v. Farley,* 13 F.3d 142 (4th Cir.1993) **(dismissing § 1983 action against West Virginia sheriff where plaintiff failed to prove constitutional deprivation);** *Dotson v. Chester,* 937 F.2d 920 (4th Cir. 1991) **(finding county liable for the conduct of the sheriff in connection with a § 1983 action);** *Beardsley v. Webb,* 30 F.3d 524 (4th Cir.1994) **("[The deputy sheriff] is not a Virginia state policeman. He is a deputy sheriff of Loudoun County.");** *Goodwin v. Metts,* 885 F.2d 157 (4th Cir. 1989), *cert. denied sub nom. Maxwell v. Goodwin,* 494 U.S. 1081, 110 S.Ct. 1812, 108 L.Ed.2d 942 (1990) (South Carolina sheriff); *Logan v. Shealy,* 660 F.2d 1007 (4th Cir. 1981), *cert. denied sub nom. Clements v. Logan,* 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982).

The Court is aware of the disagreement among district courts in this Circuit concerning whether a sheriff is a "person" for purposes of § 1983. Defendants cite the unpublished case of *Gulledge v. Smart,* 691 F.Supp. 947 (D.S.C.1988), *aff'd,* 878 F.2d 379 (4th Cir.1989) (table case), in which the Fourth Circuit ruled no triable issue of fact had been presented and agreed with the South Carolina district court's alternative ruling that the sheriff was a state actor. *Wallace v. Kidd,* Civil No. 3:94cv290, also cited by Defendants, is an unpublished case from this District in which it was assumed without decision that the defendants were state officials.

Defendants also rely on state cases. In *Messick v. Catawba County,* 110 N.C.App. 707, 713, 431 S.E.2d 489, 493, *rev. denied,* 334 N.C. 621, 435 S.E.2d 336 (1993), the court assumed without discussion that the sheriff was not a person under § 1983. In *Slade v. Vernon,* 110 N.C.App. 422, 429, 429 S.E.2d 744, 748 (1993), the court found there had been no showing of a violation of a specific constitutional right. As an alternative ruling, the court noted the defendants could not be liable in their official capacities under § 1983 because plaintiff sought only monetary damages, citing *Lenzer v. Flaherty,* 106 N.C.App. 496, 418 S.E.2d 276, *rev. denied,* 332 N.C. 345, 421 S.E.2d 348 (1992). That case held that employees of the state Department of Human Resources were not persons under § 1983. Thus, it is inapposite to a ruling regarding sheriffs. *Clark v. Burke County,* 117 N.C.App. 85, 89, 450 S.E.2d 747 (1994) does not appear to be a cause of action based on § 1983. Likewise, *Smith v. Phillips,* 117 N.C.App. 378, 381, 451 S.E.2d 309, 312 (1994), appears to be a case based on negligence, not § 1983. None of these cases overrules the holding in *Hull v. Oldham* 104 N.C.App. 29, 41, 407 S.E.2d 611, 618, *rev. denied,* 330 N.C. 441, 412 S.E.2d 72 (1991), that "[i]n providing for the organization of local governments, our Constitution does not make sheriffs state rather than local officers." Nor has the state supreme court made a determination contrary to this holding.

Defendants also cite the opinion in *Braswell v. Ellis,* 950 F.Supp. 145 (E.D.N.C.1995) (Dupree, J.) in support of their arguments. This Court holds Judge Dupree in high esteem, but respectfully disagrees with his analysis. In concluding that sheriffs are state officials, the court applied the test for determining whether Eleventh Amendment

immunity should be afforded. However, the issue of Eleventh Amendment immunity is distinct from qualification as a "person" under § 1983. Indeed, one does not reach the issue of immunity unless the defendant at issue has been found to be person subject to suit under § 1983.

In addition, while it is true North Carolina's state legislature has enacted legislation regarding sheriffs and their departments, this Court cannot find such legislation warrants a conclusion that state control is so rampant that these departments have become arms of the state. *See, e.g.,* N.C. Const. art. VII, § 2 and N.C.Gen.Stat. § 163–1 (**concerning election and term of office**); N.C.Gen.Stat. § 162–1 (**defining disqualifications for sheriffs**); N.C.Gen. Stat. §§ 162–13, *et seq.* (**describing the duties**); N.C.Gen.Stat. § 143–166.30 (**allowing for participation in the state retirement system**). Sheriffs are traditionally law enforcement providers for counties, supplying the gap between the State Highway Patrol and municipal police officers. Their salaries are paid by the counties who also pay any liability claim against them. They are elected by the constituency of the county, not the state. To find that state regulation in some areas converts sheriffs into state employees would be tantamount to finding that they are also federal employees because regulated by various federal laws, such as § 1983. Moreover, such a finding would lead to great disparity among the various county employees, such as social services workers, who are clearly subject to suit under § 1983. Accordingly, this Court holds that the sheriff of a county in North Carolina is a person subject to suit under § 1983.

■■■ Likewise, Defendant Good is not entitled to Eleventh Amendment immunity. The parties each contend the test announced by the Supreme Court in *Hess v. Port Auth. Trans–Hudson Corp.,* 513 U.S. 30, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994), proves their respective positions. In *Hess,* the Supreme Court stated that the primary concerns "'that underpin the Eleventh Amendment,' [are] that federal court judgments not deplete state treasuries and that the sovereign 'dignity' of the states be preserved." *Gray v.*

*Laws,* 51 F.3d 426, 431 (4th Cir.1995) (quoting *Hess,* 513 U.S. at ——, 115 S.Ct. at 406). Here, there is no question of depletion of the state treasury because the insurance carrier for the county has been named a party. Moreover,

> it appears that a determination that the state treasury will be liable for a particular judgment is largely, if not wholly, dispositive of entitlement to Eleventh Amendment immunity.... If, on the other hand, the state's treasury will not be affected by a judgment in the action, then the availability of immunity ... must be determined by resort to the other relevant considerations referenced by the Court, chief among which are whether the suit will jeopardize "the integrity retained by [the] State in our federal system," and whether the state possesses such control over the entity claiming Eleventh Amendment immunity that it can legitimately be considered an "arm of the state."

*Gray,* 51 F.3d at 433–34 (citations omitted). Defendants have offered no evidence on these issues and thus, have not met their first burden on the motion for summary judgment.

## C. Sheriff Good's entitlement to qualified immunity.

■■■ Defendants also argue the sheriff is entitled to qualified immunity from suit against him in his individual capacity. Government officials sued in their individual capacity are protected by qualified immunity as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *DiMeglio v. Haines,* 45 F.3d 790, 794 (4th Cir.1995) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). This determination is a matter of law. *Id.*

■■■ To rule on qualified immunity, the Court must identify the right violated and determine whether the right was clearly established at the time it was violated. *Id.,* at 795; *see also, Pritchett v. Alford,* 973 F.2d 307, 312 (4th Cir.1992). Next, the Court should ascertain whether a reasonable person in the Defendants' position would have

known that his actions would violate such a right. *Id.* At the time of the actions taken here, it was clearly established by Supreme Court and Fourth Circuit precedent, *see infra,* that an employee could not be discharged for the exercise of his right to free speech. *Connick,* 461 U.S. at 142, 103 S.Ct. at 1687 ("[F]or at least 15 years, it has been settled that an [employer] cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expressions."). Moreover, Sheriff Good's comments during the taperecorded conversation show· that not only was he aware of such rights; but also, he clearly intended to violate the written policy of his own department in order to squelch the support by his staff of any candidate other than himself.

## D. Punitive damages in connection with the § 1983 cause of action.

▮ "Punitive damages are available in section 1983 actions only 'when the defendant's conduct is shown to be motivated ·by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Goodwin,* 885 F.2d at 165 (quoting *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983)). Here, Sheriff Good has been sued in both his individual and official capacities. Defendants correctly note that punitive damages are not available against Good in his official capacity. *Biggs v. Meadows,* 66 F.3d 56, 61 (4th Cir.1995) (citing *Hill v. Shelander,* 924 F.2d 1370, 1374 (7th Cir.1991) ("[P]unitive damages [may] be recovered against a government actor only in an individual capacity suit.")).

▮ However, the facts of the case are sufficient to submit the question of punitive damages in Good's individual capacity to the jury for determination. *Beardsley,* 30 F.3d at 531 (holding the issue of punitive damages was a jury question concerning a defendant who told plaintiff not to complain of sexual harassment because she had chosen a field primarily dominated by men); *see also, Sevigny v. Dicksey,* 846 F.2d 953, 959 (4th Cir.1988) (punitive damages awarded against police officer who disbe-

lieved mother's statement that her child drove car into a garage despite two witnesses' corroboration and arresting her as well as notifying department of social services of her neglect). The taperecorded statement in which Good told employees not to support or campaign for anyone except him is evidence of malicious or wanton conduct done in reckless disregard or indifference of their rights. Likewise, a jury could believe the evidence that Good told all employees at a meeting not to campaign for anyone else and that he determined to fire Carter in retaliation for his open defiance of Good's orders.

## E. State law claims.

▮ In addition to Plaintiff's federal cause of action under § 1983, he also stated a cause of action for a violation of the North Carolina Constitution. Defendants move for summary judgment on the ground that where there is an adequate state law remedy, a direct cause of action is not available under the State Constitution. While Defendants cite *Corum v. University of North Carolina,* 330 N.C. 761, 782, 413 S.E.2d 276, 289 (1992), in support of their argument, that case also involved a Plaintiff who sued pursuant to a federal § 1983 claim and a direct claim based on the State Constitution. In fact, that case also involved the termination of an employee for his free speech and the court held, without even mentioning a cause of action for wrongful termination, "we hold that plaintiff does have a direct cause of action under the State Constitution for alleged violations of his freedom of speech rights, guaranteed by Article I, Section 14." *Id.,* at 786, 413 S.E.2d at 292. Defendants' motion is thus denied.

Next, Defendants argue that the state constitutional claims for violation of free speech fail for the same reasons as the federal claim. In view of the ruling *infra,* this argument as well is rejected.

▮ Plaintiff alleges a cause of action for a violation of N.C.Gen.Stat. § 153A–99 which prohibits counties from restricting county employees in any manner concerning their political affiliation and activities. Defendants seek judgment on the grounds that sheriffs are not county employees. This argument

has been previously rejected. Moreover, the North Carolina Court of Appeals has recently ruled that discharge of a county employee because of his political affiliation and activities, if true, contravenes rights guaranteed by the State Constitution and the prohibition against political coercion in county employment, citing N.C.Gen.Stat. § 153A–99. *Vereen v. Holden*, 121 N.C.App. 779, 468 S.E.2d 471 (1996).

 Finally, Defendants argue that to the extent Plaintiff states a cause of action for wrongful termination in violation of public policy, that claim must be dismissed. In *Vereen,* the Court of Appeals also stated that the district court erred in dismissing a wrongful termination claim based on a violation of public policy as stated in N.C.Gen. Stat. § 153A–99. *Id.,* 468 S.E.2d at 475. Thus, this motion as well is denied.

### F. Motion to strike affidavit of Jim Butler.

In rendering the above ruling, the Court found it unnecessary to depend on the affidavit in question. Thus, Defendants' motion to strike the affidavit is granted without any ruling as to its admissibility.

### IV. ORDER

**IT IS, THEREFORE, ORDERED** that Defendants' motion for summary judgment is hereby **DENIED.**

**IT IS FURTHER ORDERED** that Defendants' motion to strike the affidavit of Jim Butler, dated March 28, 1996, is hereby **ALLOWED,** and this affidavit is hereby **STRICKEN** from the record.