**Kathy W. KNIGHT, Plaintiff,**

v.

**C.D. VERNON, individually and in his official capacity as Sheriff of Rockingham County; and the County of Rockingham, Defendants.**

**No. Civ.A. 1:97CV00755.**

United States District Court,
M.D. North Carolina.

Sept. 8, 1998.

Robert M. Elliot, Elliot, Pishko, Gelbin & Morgan, P.A., Winston–Salem, NC, for Kathy W. Knight, Plaintiff.

James Redfern Morgan, Jr., Womble Carlyle Sandridge & Rice, Winston–Salem, NC, for C.D. Vernon, individually and in his official capacity as Sheriff of Rockingham County, Defendants.

### MEMORANDUM OPINION

BULLOCK, Chief Judge.

Plaintiff, Kathy W. Knight, was one of seven employees of the Rockingham County Sheriff's Department fired by Defendant C.D. Vernon on the same day following his primary election in 1994. Plaintiff has sued Defendant Vernon and Defendant Rockingham County alleging, *inter alia*, that her firing violated her right to free speech and due process under the United States Constitution. Plaintiff also makes claims under the North Carolina Constitution and common law. A companion case brought by two of the seven terminated employees reached decision by this court in *Harter v. Vernon* (*Harter* I), 953 F.Supp. 685 (M.D.N.C.), *aff'd,* 101 F.3d 334 (4th Cir.1996) (*Harter* II), *cert. denied,* —— U.S. ——, 117 S.Ct. 2511, 138 L.Ed.2d 1014 (1997), on motion for reconsideration, 980 F.Supp. 162 (M.D.N.C.1997) (*Harter* III). This case is presently before the court on Defendants' motions to strike, motion for judgment on the pleadings, and motion for summary judgment. For the reasons that follow, the court will deny Defendant Vernon's motion for judgment on the pleadings, grant in part Defendants' motion to strike, and grant in part Defendants' motion for summary judgment.

### FACTS

The court takes the evidence in the light most favorable to Plaintiff, as it must at this stage of the proceedings. Vernon hired Plaintiff for the position of Jailer I in September 1989. At her interview, Vernon inquired about her party affiliation and indicated to her that she would be expected to support him in future elections. On her first or second day of employment, Plaintiff received a copy of the Rockingham County Employee Handbook. It is undisputed that Plaintiff had neither a written contract nor a fixed term of employment.

As a Jailer I, Plaintiff was generally responsible for monitoring the operation of the jail and performing duties required for the supervision, care, processing, and transportation of the inmates. In processing inmates, Plaintiff was responsible for:

maintaining records, accepting incoming prisoners, logging them in, processing them, which is fingerprinting, getting the information pertaining to the addresses and families, marking their personal articles and storing them, routing them to the nearest nurse for physical examinations

and checking them for lice and disease, and making sure everybody is given a bath and new clean clothing issued. (Vernon Dep. at 64). Plaintiff's duties also required checking on the inmates every half hour, logging their requests, distributing and logging the medication and supplies issued to them, sending inmates to court appearances, serving food to the inmates, managing inmate visitation, transporting inmates to and from prison or mental facilities, and maintaining general order and security. (Vernon Dep. at 64; King Dep. at 44; Knight Dep. at 23). The jailers are also responsible for processing the inmates for discharge from jail. Plaintiff's supervisor testified that a jailer's duties were thirty-to-forty per cent paperwork (*e.g.*, documenting commitment orders and processing inmates) and sixty to seventy per cent supervising inmates and maintaining order and security.

Plaintiff received several positive performance appraisals as well as a commendation during her term of employment. Plaintiff was eventually promoted to the position of Jailer II and served as acting sergeant in the absence of her supervisor, Sergeant Reggie King. There are no differences in job duties between Jailer I and Jailer II.

On January 8, 1994, the Greensboro *News & Record* published a story on the operation of the inmate trust fund at the Rockingham County Jail. Prior to January 1994, prisoners incarcerated at the Rockingham County Jail were required to deposit their cash in a cash box maintained by the jail employees as part of the incarceration process. The amount deposited was recorded in a ledger. Upon the inmate's release, the amount deposited was returned. The cash held by the jail employees on behalf of the inmates was known as the "inmate trust fund." Prior to 1994, it was common practice for the jailers to cash checks on the inmate trust fund. The story published by the newspaper reported that certain jailers and other employees of the Sheriff's Department were taking cash from the inmate trust fund in exchange for personal checks that would remain uncashed for weeks at a time. The newspaper alleged that these Sheriff's Department employees were writing checks for "interest-free loans" at inmates' expense. There is some evidence that this story disrupted the working relationships among the jailers, causing embarrassment and creating suspicions regarding who leaked the information to the newspaper.

Vernon had not been aware that jailers were cashing personal checks on the inmate trust fund until so informed by Sergeant King in late December 1993. Upon learning of this practice, Vernon instructed his Chief Jailer to open up a bank account for inmate funds and to stop the practice of cashing checks on the inmate trust fund. Vernon did not, however, take any further action to investigate whether any criminal wrongdoing had occurred.

In her position as jailer, Plaintiff was well aware of her co-workers' use of the inmate trust fund to cash their checks. She testified that she photocopied the checks in the inmate trust fund on a periodic basis to protect herself against any charges of wrongdoing. Plaintiff claims that, with one exception, she never showed these photocopies to anyone or discussed the trust fund with anyone outside of the Sheriff's Department. In late 1993, Plaintiff showed the photocopies to a friend, Roger Hair, who happened to be a magistrate, and told him about the jailers' use of the inmate trust fund. Hair advised her that the actions of the jail employees were potentially criminal. Plaintiff then advised her superior, Reggie King, that this use of the inmate trust fund should not be allowed to continued. Plaintiff adamantly denies providing any information concerning the inmate trust fund to the press or showing the photocopies of the checks to anyone else.

In the spring of 1994, Vernon stood for re-election against three candidates in the Democratic primary. Vernon's chief rival was a former employee of the Sheriff's Department, Sam Page. According to Plaintiff, Vernon put the resources of the Sheriff's Department to work to get re-elected. Vernon's top officers solicited the support of deputy sheriffs while on duty at shift meetings. Vernon's secretary also served as his campaign treasurer. In April 1994, Plaintiff's husband, Deputy Sheriff Robert Knight, met with Vernon. Vernon stated that he had heard rumors that Mr. Knight was supporting Sam Page. Mr. Knight de-

nied these rumors and asked Vernon what he should do to make things right. Vernon showed him "a list of Sam Page's contributors," (Aff. of R. Knight, ¶ 6), and stated that a person would have to contribute $100.00 or more to an election campaign for him to know about it. Mr. Knight interpreted this as a request to donate over $100.00 to Vernon's campaign. Vernon then asked to meet with Mr. Knight and Plaintiff the next day.

At this meeting, Vernon accused Plaintiff of leaking information about the inmate trust fund to the press. Vernon also stated that he had heard that Plaintiff and her husband were campaigning for Page and that he knew they did not have a sign supporting Vernon in their yard. Plaintiff and Mr. Knight tried to convince Vernon that they were not openly supporting any particular candidate in the primary, and that they would continue to discharge their duties at the highest level. Vernon was unconvinced by their statements. When Plaintiff and her husband asked Vernon what they should do, he stated that they should attend the rallies, meetings, and activities supporting his re-election and place signs in their yard. Mr. Knight responded by asking Vernon whether people would think that they were spying for another candidate. Vernon agreed that it was possible, but added, "I don't know what to tell you, but seven weeks after the primary, it will be all over and everyone will stop talking about it." (Aff. of R. Knight, ¶ 8). Vernon stated at the conclusion of the meeting, "Don't think that putting up posters will get you back in my good graces, because it won't." (Id.). Plaintiff interpreted this to mean that she and her husband would be fired for failing to support Vernon's campaign.

Vernon won the primary election on May 3, 1994. Because he had no formal opposition in the general election, this victory for all practical purposes constituted his re-election as Sheriff. Three weeks later, Vernon directed Detective Jim Kendrick to conduct an internal investigation into who had given the newspaper the photocopies of the checks in the inmate trust fund and the information which formed the basis for the newspaper article. Vernon also asked Kendrick to investigate whether photographs had been taken from an inmate. After a six-week investigation, Detective Kendrick determined that Plaintiff had, in fact, provided photocopies of the employee checks in the trust fund to the newspaper and had probably stolen the inmate's photographs. In a memorandum dated July 8, 1994, Kendrick summarized the results of his investigation and recommended disciplinary action against Plaintiff.

On July 15, 1994, Vernon terminated Plaintiff from her position as Jailer II. At the same time, Vernon fired six other employees: Wayne Harter, Robert Payne, Richard Lintecum, Robert Knight, Dean Vendable, and Reggie King. There is some evidence that each of those employees terminated either supported Page or were rumored to have done so, or did not actively support Vernon. Following her termination, Plaintiff filed a grievance with Rockingham County. The grievance was never heard.

On July 11, 1997, Knight filed suit against Vernon in Rockingham County, alleging: (1) a claim under 42 U.S.C. § 1983 for violation of her free speech rights; (2) a claim under 42 U.S.C. § 1983 for a procedural due process violation; (3) claims for violation of free speech and due process rights under the North Carolina Constitution; and (4) a state tort claim for wrongful discharge. The court will consider each of these claims in turn.

## DISCUSSION

I. *Vernon's Motion for Judgment on the Pleadings*

In considering a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), this court must view the facts presented in the pleadings and the inferences drawn therefrom in the light most favorable to the non-moving party. 5A Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* Civil 2d § 1368 at 286 (Supp.1998). Dismissal under this rule is not proper unless this court finds beyond a doubt that Plaintiff could prove no set of facts in support of her claim which would entitle her to relief. *See Bruce v. Riddle,* 631 F.2d 272, 274 (4th Cir.1980). In his motion, Vernon argues that he is entitled to Eleventh Amendment immunity against suit in his official capacity. The Eleventh Amendment to the United States Constitu-

tion provides a state with immunity from suits brought in federal court by citizens of that or another state. *Edelman v. Jordan,* 415 U.S. 651, 662–63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). State officers acting in their official capacity are also entitled to Eleventh Amendment immunity. *See Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). The Eleventh Amendment does not protect local government entities or officials from suit. Thus, the issue of Eleventh Amendment immunity turns on whether Vernon, as Sheriff of Rockingham County, is a state or local actor.

Both this court and the Fourth Circuit have examined this precise issue and determined that Sheriff Vernon is a local actor. *See Harter* I, 953 F.Supp. at 689–92; *Harter* II, 101 F.3d at 340–43. *Harter* II provides controlling authority that Sheriff Vernon does not have Eleventh Amendment immunity, in his official capacity, from suit in federal court. The Fourth Circuit reached this conclusion through a four-pronged inquiry based upon *Hess v. Port Auth. Trans–Hudson Corp.,* 513 U.S. 30, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994). The Fourth Circuit considered each of the following factors: (1) whether or not the State would be liable for any money damages awarded against the sheriff; (2) whether the sheriff was subject to state or local control; (3) whether the sheriff was involved in local or statewide concerns; and (4) whether or not state law treated the sheriff as an agent of the State. *See Harter* II, 101 F.3d at 340–43.[1]

Vernon seeks to have this ruling overturned, however, on the basis of two cases decided by the Supreme Court after the Fourth Circuit reached its decision in *Harter* II: *Regents of the Univ. of California v. Doe,* 519 U.S. 425, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997), and *McMillian v. Monroe County,* 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997). Vernon argues that these cases have effectively overruled *Harter* II. The court cannot agree.

The Supreme Court held in *Doe* that Eleventh Amendment immunity protects the State from the risk of adverse judgments even though the State may be indemnified by a third party. *See Doe,* 117 S.Ct. at 904. Nothing in *Doe* undermines the Fourth Circuit's decision in *Harter* II.

■ The issue in *McMillian* was whether an Alabama sheriff, when acting in his law enforcement capacity, was a policymaker for the County for the purpose of imputing liability to the Defendant County under 42 U.S.C. § 1983. The Supreme Court held that whether a particular official has "final policymaking authority" for Section 1983 purposes is largely a question of state law. *McMillian,* 117 S.Ct. at 1737. Although the Court found that an Alabama sheriff acts for the state when executing his law enforcement duties, the Court cautioned that under its approach sheriffs may be state policymakers for certain purposes in some states and not in others. *See id.* at 1741–42 & n. 10. The court is aware that a few courts in other jurisdictions have cited *McMillian* in analyzing whether or not an entity enjoys Eleventh Amendment immunity. *See, e.g., Huff v. Zaruba,* 150 F.3d 682 (7th Cir.1998); *Vinson v. Clarke County,* 10 F.Supp.2d 1282, 1998 WL 333524 (S.D.Ala. June 17, 1998); *Carter v. City of Philadelphia,* 4 F.Supp.2d 386 (E.D.Pa.1998); and *Bibbs v. Newman,* 997 F.Supp. 1174 (S.D.Ind.1998). Nevertheless, the decision in *McMillian* does not undermine the Fourth Circuit's opinion in *Harter* II because the Fourth Circuit considered and relied upon state law in holding that sheriffs are local officials and thus do not enjoy Eleventh Amendment immunity. *See Auer v. Robbins,* 519 U.S. 452, 117 S.Ct. 905, 909 n. 1, 137 L.Ed.2d 79 (1997) (holding that City Board of Police Commissioners is not entitled to Eleventh Amendment immunity where the State was not liable for the Board's financial liabilities and the Board was not subject to State's direction or control) (citing *Hess* ). This court will thus follow controlling Fourth Circuit authority and hold that Sheriff Vernon does not have Eleventh Amendment immunity from suit in federal court. Vernon's motion for judgment on the pleadings will therefore be denied.

---

1. The Fourth Circuit held that the question of whether or not the State would be liable for damages was the most important of these considerations.

## II. *Motions to Strike*

Defendants have moved to strike large portions of the affidavit testimony and declarations submitted by Plaintiff in opposition to summary judgment.[2] Most of the specific objections raised by Defendants are not well taken. In many instances, the Defendants' motion consists of mere argument about the merits of the case. Nevertheless, Defendants have raised a few valid points.

 Federal Rule of Civil Procedure 56(e) requires that affidavits in opposition to a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Thus, a court will strike conclusory statements, those containing hearsay, or those not based on personal knowledge. *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir.1996). When a party raises the issue of the admissibility of an opposing party's evidence in response to a motion for summary judgment, the court will disregard only the inadmissible portions of a challenged affidavit and consider the remainder. *Id.* Doubts about the quality or admissibility of a non-movant's evidence will be resolved against the movant. *See* 10B Charles A. Wright, Arthur R. Miller, & Mary K. Kane, *Federal Practice and Procedure: Civil* § 2738 at 342 (3d ed.1998).

 Vernon objects on the basis of hearsay to several statements contained in the affidavits and declarations submitted by Plaintiff. For example, Paragraph 8 of Plaintiff's affidavit refers to a meeting between Plaintiff's husband and Vernon as described to Plaintiff by her husband. The second sentence in Paragraph 7 of Wayne Harter's declaration refers to a statement made to him by a deputy sheriff, repeating a statement by Vernon. The first and third sentences in Paragraph 5 of Sam Page's declaration refer to information received from third parties about Vernon's campaign activities. In the seventh and eleventh sentences of Paragraph 7, Page repeats information relayed to him by Sergeant King and an unnamed source. Finally, the second sentence in Paragraph 2 in the declaration by Teresa Jefferson refers to a statement made by Lieutenant Mike Burns adverting to why Vernon had fired Richard Lintecum. The court will not consider any of these statements in ruling upon Defendants' motion for summary judgment because they constitute inadmissible hearsay. *See* Fed.R.Evid. 801(c). The court will not strike the sentences in Paragraph 6 of the Page declaration, however, which refer to statements made by the county attorney regarding his inquiry into pressure to support Sheriff Vernon's re-election effort. These statements constitute admissions by the Defendants Vernon and Rockingham County and are thus admissible. *See* Fed.R.Evid. 801(d)(2)(D).[3] Nor will the court strike the other statements that Defendants challenge as hearsay, because Defendants have failed to demonstrate their inadmissibility.

 Vernon also objects to several statements contained in Plaintiff's assembly of affidavits and declarations on the basis that they are conclusory, not rational, or lacking specificity. The court has considered each statement subjected to this objection. The court will deny Defendants' motion to strike on these bases, with one exception. In his declaration, former Deputy Sheriff Dean Venable asserts that "[b]ased on [his] evaluation and statistics ... [his] performance could not have been the reason for [his] termination." (Venable Decl. ¶ 5). This statement is clearly the type of conclusory assertion that is susceptible to a motion to strike. *See Evans*, 80 F.3d at 962 (stating that self-serving opinions without objective corroboration are not significantly probative and may be stricken).

---

**2.** By separate motion, Defendants also seek to strike Plaintiff's Exhibits 9 through 24. These exhibits are copies of documents produced by Defendants in this case and the companion case *Harter* I. Because the Defendants have not persuaded the court that these exhibits are not properly authenticated, the court will deny this motion.

**3.** Unlike the admissions by the county attorney, the statement by Lieutenant Burns regarding the reasons for Lintecum's termination does not come within Federal Rule of Evidence 801(d)(2)(D) because there is no evidence that Lieutenant Burns was in any way involved in that matter.

■ Defendants further object to several portions of the affidavits and declarations submitted by Plaintiff on the basis that they are contradicted by the deposition testimony of the affiant or declarant. The court has examined the affidavits and declarations and the corresponding deposition testimony selected by the Defendants. With one exception, none of the statements challenged by Defendants are directly contradicted by the affiant's deposition testimony. In his declaration, former deputy Richard Lintecum recounted an instance in which "one of the Sheriff's supporters" yelled across the room at him. (Lintecum Decl. ¶ 2). At his deposition, however, Lintecum admitted that he did not know whether this person supported Vernon or not. The court will not, therefore, consider this portion of Lintecum's declaration in ruling upon Defendants' motion for summary judgment. *See Rohrbough v. Wyeth Labs., Inc.,* 916 F.2d 970, 976 (4th Cir.1990).

Defendants finally argue that for many statements contained in the affidavits and declarations assembled by Plaintiff, there is no showing that they were based upon personal knowledge. Upon considering the statements targeted by Defendants, the court must disagree. The affiants and declarants have spoken about events that occurred in their work environment. The court will resolve doubts about the admissibility of these statements against Defendants and deny the motion to strike on this basis.[4]

### III. Defendants' Motion for Summary Judgment

Summary judgment must be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the burden of persuasion on the relevant issues. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party can survive a motion for summary judgment by producing "evidence from which a jury might return a verdict in [its] favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the motion is supported by affidavits, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). In considering the evidence, all reasonable inferences are to be drawn in favor of the non-moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

### A. Section 1983 Claims against Rockingham County

■ The County seeks summary judgment on all claims against it. It is clear that a sheriff in North Carolina has final policy-making authority in employment decisions. It is also clear that he does not exercise this authority on behalf of the County. *Harter I,* 953 F.Supp. at 692–93. Because Vernon was not acting pursuant to a policy of the County in terminating Plaintiff, the County is entitled to summary judgment on her Section 1983 claims. *Id.*

### B. Procedural Due Process Claim

■ Defendants move for summary judgment on Plaintiff's claim that the Defendants denied her property right in her position without due process of law. It is clear, however, that Plaintiff had no constitutionally protected property interest in her continued employment. In North Carolina, employees are presumed to hold their jobs at will unless they have a contract for a specified term or fixed duration. *Kurtzman v. Applied Analytical Indus., Inc.,* 347 N.C. 329, 331, 493 S.E.2d 420, 422 (1997). Plaintiff admits that she had no such contract. Moreover, North Carolina law vests sheriffs with the exclusive right to hire, fire, and discipline their deputies. N.C.Gen.Stat. § 153A–103. This statute denies sheriffs' employees such as Plaintiff any property right to their employment. *See Jackson v. Long,* 102 F.3d 722, 728 (4th Cir.1996), and *Peele v. Provident Mut. Life Ins. Co.,* 90 N.C.App. 447, 451, 368 S.E.2d 892, 894–95 (1988).

---

4. The court will also deny Defendants' motion to strike as irrelevant the affidavits of former Deputy Sheriffs Harter, Payne, Lintecum, and Venable. The fact that Sheriff Vernon required his

deputies to support his election efforts is certainly relevant to his expectations with respect to jailers such as Knight, whom he also considered law enforcement officers.

Plaintiff contends, however, that she had a property right in her job that derived from the Rockingham County employment manual. North Carolina courts do not recognize unilaterally promulgated employment manuals or policies as part of the employment contract unless they are expressly included in it. *See Harter* I, 953 F.Supp. at 694 (collecting cases). In this case, Plaintiff alleged that she and all Sheriff's Department employees received a copy of the policy manual upon beginning work. She also alleges that Vernon or others within the Sheriff's Department referred her to the manual to answer her employment questions. Nevertheless, Plaintiff was never told that it was part of her employment contract. Under such circumstances, an employee handbook does not become part of the employment contract. *See Paschal v. Myers*, 129 N.C.App. 23, 497 S.E.2d 311, 315 (1998); *Harter* I, 953 F.Supp. at 694 (collecting cases). Consequently, the handbook did not give Plaintiff a protectable property interest in her job. The court will therefore dismiss Plaintiff's Section 1983 due process claim.

### C. First Amendment Claim

Plaintiff alleges that she was terminated in retaliation for her speech, which consisted of (1) her exposure of improper activity at the county jail involving the inmate trust fund; and (2) her failure to support Vernon for re-election. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. at 13). The threshold question is whether the court should analyze this claim under the political affiliation cases of *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), or the free speech cases of *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

▇▇▇▇ Plaintiff does not state a claim with respect to her allegation that she was terminated in retaliation for speech regarding improper activity involving the inmate trust fund. As the *en banc* majority of the Fourth Circuit recognized in *Boring v. Buncombe County Bd. of Educ.*, 136 F.3d 364, 371 n. 3 (4th Cir.1998), "speech" by a public employee does not equate with "protected speech." Unless the public employee's activity can be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for the court to examine the reasons for her discharge. *Connick*, 461 U.S. at 146, 103 S.Ct. 1684. The general rule is that

> when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Id.* at 147, 103 S.Ct. 1684. Thus, matters immediately concerned with the self-interest of the speaker as employee (such as a personal grievance, complaint, or expression about other matters of personal interest) do not constitute protected speech. *See Stroman v. Colleton County Sch. Dist.*, 981 F.2d 152, 156 (4th Cir.1992). Whether speech fairly relates to a public concern or a matter of immediate self-interest must be determined by the content, the forum, and the context of the speech. *Id.*

▇▇▇▇ In this case, Plaintiff's speech with respect to the inmate trust fund was limited. Plaintiff testified that she copied the checks in the trust fund, showed the copies to Roger Hair, and explained to him the procedures used by jail employees in cashing checks on the fund. It is clear that she did so with the intent to protect herself rather than to publicize the issue. Hair advised Plaintiff of what she needed to do to protect herself, and Plaintiff followed this advice. After speaking with Hair, Plaintiff told her supervisor "that he had better handle it," (Knight Dep. at 50), and she put away the photocopies of the checks. She denies alerting the media or giving anyone photocopies of the checks she made from the trust fund. Because her activities concerned only her personal interest as an employee in the jail, Plaintiff's speech with respect to the inmate trust fund does not merit protection under the First Amendment. *Cf. Stroman*, 981 F.2d at 157 (stating that a public employee's airing of grievances is not protected by

First Amendment); *Jurgensen v. Fairfax County*, 745 F.2d 868, 879–80 (4th Cir.1984) (public employee who surreptitiously provided internal report to newspaper as a result of the reporter's pressure to do so did not engage in speech on a matter of public concern). Plaintiff thus states a claim only for termination in retaliation for her failure to support Vernon for re-election.[5]

In *Jenkins v. Medford*, 119 F.3d 1156 (4th Cir.1997), the Fourth Circuit held, *en banc*, that a deputy sheriff's allegation that he was terminated for failing to associate himself politically with the sheriff's campaign should be analyzed under the *Elrod–Branti* political patronage cases. *Jenkins*, 119 F.3d at 1160. On this point, even the dissenting judges agreed. *See id.* at 1169 (Motz, J., dissenting); *id.* at 1171 (Ervin, J., dissenting) (endorsing the First Amendment analysis undertaken by Judge Motz). Even though Plaintiff was neutral during the campaign, whereas the plaintiffs in *Jenkins* "worked for or otherwise supported" the defendant's opponents, *id.* at 1159, Plaintiff's complaint should be analyzed as a political affiliation case under *Elrod–Branti*. *See Harter III*, 980 F.Supp. at 163–64.

 The Supreme Court has made clear that "[a] State may not condition public employment on an employee's exercise of his or her First Amendment rights." *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 717, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996). Further, "[a]bsent some reasonably appropriate requirement, government may not make public employment subject to the express condition of political beliefs or prescribed expression." *Id.* The Court declared patronage dismissals unconstitutional in *Elrod* because the practice limited political belief and association in violation of the First and Fourteenth Amendments. *See Elrod*, 427 U.S. at 355–60, 96 S.Ct. 2673. At the same time, however, the Court created a narrow exception to give effect to the democratic process. The Court allowed patronage

dismissals of those holding policymaking positions, reasoning that this exception would, in part, advance the important governmental goal of assuring "the implementation of policies of [a] new administration, policies presumably sanctioned by the electorate." *Elrod*, 427 U.S. at 367, 96 S.Ct. 2673.

Four years later, the Court modified the test: "[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518, 100 S.Ct. 1287. In conducting this inquiry, the Fourth Circuit directed in *Jenkins* that district courts are to examine "the specific political and social roles" of "the specific position at issue." *Jenkins*, 119 F.3d at 1163, 1164. "If the position resembles 'a policymaker, a communicator, or a privy to confidential information,' then loyalty to the sheriff is an appropriate requirement of the job," *id.* at 1164 (quoting *Stott v. Haworth*, 916 F.2d 134, 141–42 (4th Cir.1990)), and the sheriff may dismiss the employee from that position either because of party affiliation or campaign activity.

 Therefore, as directed by the Fourth Circuit in *Jenkins*, this court must consider the specific political and social roles of sheriffs and their jailers in North Carolina. As the Fourth Circuit documented in *Jenkins*, the office of sheriff is an important political office in the state. One of the Sheriff's core responsibilities is to maintain the county jail. *See* N.C.Gen.Stat. § 162–22 ("The sheriff shall have the care and custody of the jail in his county; and shall be, or appoint, the keeper thereof."); N.C.Gen.Stat. § 17E–1 ("The sheriff ... acts as *ex officio* detention officer."). Although the sheriff may not delegate this responsibility, he may appoint deputies or employ others to assist him in this duty. *See* N.C.Gen.Stat. § 162–24. Those

---

5. Plaintiff cannot argue that Vernon violated her First Amendment rights by terminating her on the basis of his belief that she routed checks to the press, thus exposing the improper use of the inmate trust fund. Retaliation on the basis of a perception that a public employee engaged in protected First Amendment activity, where the

employee has not in fact done so, does not constitute a constitutional violation. *See Jones v. Collins*, 132 F.3d 1048, 1053 (5th Cir.1998); *Fogarty v. Boles*, 121 F.3d 886, 890 (3d Cir.1997); and *Barkoo v. Melby*, 901 F.2d 613, 619 (7th Cir.1990).

whom he appoints occupy the position of detention officer, *i.e.,* jailer. A sheriff's appointed jailer will generally be regarded as the sheriff's deputy. *See Sutton v. Williams,* 199 N.C. 546, 155 S.E. 160 (1930); *see also* 12 N.C.Admin.Code § 10B.0103(13) (1997) (detention officer controls and supervises inmates in the county jail "under the direct supervision and management of the sheriff"). The sheriff may thus be held liable for the acts or omissions of his appointed jailers. *See, e.g., State ex rel. Williams v. Adams,* 288 N.C. 501, 219 S.E.2d 198 (1975).

The duties of jailers are defined by state law. Jailers must receive, incarcerate, and retain arrestees brought to the jail pursuant to commitment orders. *See* N.C.Gen.Stat. § 15A–521(c). Jailers must provide supervision and ensure that custody in the jail is secure and that, in an emergency, inmates will be protected. N.C.Gen.Stat. § 153A–224(a). In a medical emergency, jailers must secure emergency medical care for the inmates. N.C.Gen.Stat. § 153A–224(b). The immediate government of inmates is entrusted to the jailer, who must see that the inmates conduct themselves in a decent and orderly manner. Maintaining the care and custody of the jail means more than opening and closing cell doors. Rather, it involves classification and housing of inmates, fire safety, security, supervision of inmates, sanitation and personal hygiene, commissary or canteen services, food and meal service, and inmate health care and exercise, in addition to administrative duties. *See* 10 N.C.Admin.Code ch. 3J (1997). To this end, jailers are trained in the supervision of inmates, contraband searches, security, crisis management, investigative processes in the jail, transporting inmates, and medical care, among other topics. *See* 12 N.C.Admin.Code § 10B.0601 (1997). Jailers generally have the power to make reasonable rules and regulations for the government of inmates, and to inflict punishment for the infraction of these rules. The standard of care owed by a jailer to an inmate placed in his care is to keep the inmate safe and free from harm, to render him medical aid when necessary, and to treat him humanely and refrain from oppressing him. *See* N.C.Gen.Stat. § 162–55. It is also the jailer's duty to keep the jail clean and sanitary.

In Rockingham County, those certified law enforcement officers who had the seventeen-week course in basic law enforcement and worked as detention officers had the rank of Jailer II. There is no difference in job duties between a Jailer I (unsworn employee) and a Jailer II (sworn law enforcement officer). It is clear that as jailer Plaintiff represented the sheriff in the performance of one of his core functions and, in doing so, she exercised a degree of discretion. As mentioned *supra,* Plaintiff processed inmates, took care of inmates' needs, and supervised the inmates in addition to discharging a number of administrative duties. Sergeant King testified that Plaintiff's duties were thirty to forty per cent paperwork. (*e.g.,* documenting commitment orders and processing inmates) and sixty to seventy per cent supervising inmates and maintaining order and security.

In analyzing a position similar to that of jailer, the Fourth Circuit held in *Jenkins* that the position of deputy sheriff is one for which political affiliation and loyalty are appropriate job requirements. *Jenkins* is not directly on point for this case because the Fourth Circuit limited its holding to deputy sheriffs "actually sworn to engage in law enforcement activities on behalf of the sheriff." *Jenkins,* 119 F.3d at 1165. The logic of the Fourth Circuit's analysis in *Jenkins,* however, compels the conclusion that jailers should be treated like deputies for the purpose of this case.

In *Jenkins,* the Fourth Circuit relied upon several factors in finding that North Carolina sheriffs depend upon loyal deputies to help them implement their policies. First, sheriffs generally include deputies within the sheriff's core group of advisors. Second, deputies on patrol work autonomously and exercise discretion in performing their law enforcement duties. Third, deputies engaged in law enforcement necessarily make some decisions that create policy. Fourth, deputies have a responsibility to foster public confidence in law enforcement. Fifth, the sheriff depends upon his deputies to provide him with truthful and accurate information. Finally, deputies are the general agents of the sheriff, for whose conduct the sheriff may

be civilly liable. *Jenkins,* 119 F.3d at 1162–63.

Most, if not all, of these considerations apply with equal force to a sheriff's jailers. In providing care and custody to their inmates, jailers work relatively autonomously and exercise some degree of discretion. Jailers are often called upon to make decisions regarding security and discipline that may in effect create policy. Because jailers work directly with the public and have a duty to protect the public, *see* N.C.Gen.Stat. § 153A–216(1), their performance directly affects public confidence in law enforcement. Because the jailers maintain and run the jail on behalf of the sheriff, they have a duty to provide him with truthful and accurate information. *See* N.C.Gen.Stat. § 17E–2(3)(b) (detention officer is appointed "through the special trust and confidence of the sheriff"). Finally, jailers are the general agents for the sheriff and operate the county jail on his behalf. *See* N.C.Gen.Stat. § 162–22; N.C.Gen.Stat. § 162–24; N.C.Gen.Stat. § 17E–1. As a result, the sheriff may be subject to civil liability for his jailers' acts or omissions. *See Dunn v. Swanson,* 217 N.C. 279, 7 S.E.2d 563 (1940); *Davis v. Moore,* 215 N.C. 449, 2 S.E.2d 366 (1939); and *Sutton v. Williams,* 199 N.C. 546, 155 S.E. 160 (1930); *see also Slade v. Vernon,* 110 N.C.App. 422, 429 S.E.2d 744 (1993) (injured inmate's forecast of evidence held sufficient to maintain an action for negligence against the sheriff).

Although the position of jailer traditionally revolves around more limited objectives than does the position of deputy sheriff as a sworn law enforcement officer, both positions require the occupant to function in some degree as the alter ego of the sheriff and ensure that the policies and goals of the office are implemented. Jail conditions and security are often issues in election campaigns. Insofar as jailers represent the sheriff in maintaining the custody of prisoners and enforcing the law so as to maintain a safe and orderly jail, the role of jailer is sufficiently similar to the role of deputy sheriff to bring jailers within the policymaker exception to the *Elrod–Branti* rule. *Cf. Jenkins,* 119 F.3d at 1162–63 (explaining why a sheriff must depend on loyal subordinates to help him implement his policies).

### D. State Law Claims

Plaintiff's remaining claims arise under the North Carolina Constitution and the common law of wrongful discharge. In the absence of a federal action, these state law claims should also be dismissed. *See Jenkins,* 119 F.3d at 1165.

## CONCLUSION

For the foregoing reasons, the court will deny Defendant Vernon's motion for judgment on the pleadings. The court will grant in part Defendants' motion to strike Plaintiff's affidavits and declarations and will deny Defendants' motion to strike Plaintiff's exhibits. The court will also grant Defendants' motion for summary judgment on Plaintiff's free speech and due process claims under the United States Constitution. Plaintiff's state law claims will be dismissed in the absence of a federal action.

An order and judgment in accordance with this memorandum opinion shall be entered contemporaneously herewith.

### *ORDER and JUDGMENT*

For the reasons stated in the memorandum opinion filed contemporaneously herewith,

IT IS HEREBY ORDERED that Defendant C.D. Vernon's motion for judgment on the pleadings [Doc. # 11] is **DENIED**;

IT IS FURTHER ORDERED that Defendant Vernon's and Defendant Rockingham County's motion to strike Plaintiff's Exhibits 9–24 [Doc. # 38] is **DENIED**;

IT IS FURTHER ORDERED that Defendants' motion to strike portions of affidavits and declarations submitted by Plaintiff [Doc. # 40] is **GRANTED** with respect to Paragraph 8 of Plaintiff's affidavit (Plaintiff's Exhibit 1); the second sentence of Paragraph 7 in the declaration of Wayne Harter (Plaintiff's Exhibit 3); the third sentence of Paragraph 2 in the declaration of Richard Lintecum (Plaintiff's Exhibit 5); the first and third sentences of Paragraph 5 and the seventh and eleventh sentences of Paragraph 7 in the declaration of Sam Page (Plaintiff's Exhibit 6); the fourteenth sentence of Paragraph 5 in the declaration of Dean Venable (Plaintiff's

Exhibit 7); and the second sentence of Paragraph 2 in the declaration of Teresa Jefferson (Plaintiff's Exhibit 8). Defendants' motion to strike [Doc. # 40] is **DENIED** in all other respects;

IT IS FURTHER ORDERED AND ADJUDGED that Defendants' motion for summary judgment [Doc. # 13] is **GRANTED** on Plaintiff's free speech and due process claims under the United States Constitution and these claims are **DISMISSED** with prejudice; and

IT IS FURTHER ORDERED that Plaintiff's state law claims are **DISMISSED** without prejudice.